UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

       - v. -          :          INDICTMENT

ROBERT COPLAN,          :          (S1) 07 Cr. 453 (SHS)
MARTIN NISSENBAUM,
RICHARD SHAPIRO,          :
BRIAN VAUGHN,
DAVID L. SMITH, and          :
CHARLES BOLTON,
          :
           Defendants.
          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  FEB 1 9 2008
```

## COUNT ONE

**(Conspiracy)**

The Grand Jury charges:

### Background

1.      At all times relevant to this Indictment, Ernst & Young ("E&Y") was
one of the largest accounting firms in the world.  E&Y provided audit services to many of the
world's largest corporate clients, and provided tax services to corporate and individual clients,
including some of the wealthiest individuals in the United States.  Those tax services included
preparing tax returns, providing tax advice and tax planning advice, and representing clients in
audits by the Internal Revenue Service ("IRS") and litigation with the IRS in Tax Court.

2.      At all times relevant to this Indictment, as part of its tax practice, E&Y had
a business unit that was responsible for providing tax advice, as well as financial planning
advice, to individuals.  That business unit was known as Personal Financial Counseling, or

"PFC." E&Y had partners and other professionals throughout the country who were members of the PFC practice.

   3. At all times relevant to this Indictment, E&Y also had a department within its tax practice known as the National Tax Department ("National Tax"). The individuals assigned to National Tax were generally experts in particular areas of taxation, and they provided expert tax advice to E&Y professionals in the field. Within National Tax was a sub-group of experts whose particular areas of expertise related to E&Y's PFC practice.

   4. In or about early 1998, the national leader of PFC formed a group that would devote itself to designing, marketing, and implementing high-fee tax strategies for individual clients. These strategies included tax shelters that could be used by high-net-worth clients to eliminate, reduce or defer taxes on significant income or gains. The group initially called itself the "VIPER Group" (an acronym for "Value Ideas Produce Extraordinary Results"), but changed its name to the "Strategic Individual Solutions Group," or "SISG," in or about early 2000.

   5. Defendants ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN ("the E&Y defendants") were members of the VIPER/SISG group for all or a significant part of the period relevant to this Indictment. The E&Y defendants worked together with banks, financial institutions, investment advisory firms, law firms and others, including defendants DAVID L. SMITH and CHARLES BOLTON, to design, market and implement tax shelters called CDS ("Contingent Deferred Swap"); COBRA ("Currency Options Bring Reward Alternatives"); CDS Add-On; and PICO ("Personal Investment Corporation").

6.    The tax shelters developed by the VIPER/SISG group were marketed to clients and prospective clients by members of the group, as well as by PFC professionals located throughout the country, who had primary responsibility for client contact.  In or about mid-1999, certain PFC professionals around the country were designated to be members of the "Quickstrike Team," a nationwide area-based network created to provide greater efficiency in the marketing and execution of the VIPER/SISG strategies, including tax shelters.

### The Defendants

7.    At all times relevant to this Indictment, defendant ROBERT COPLAN, a lawyer with a Master's Degree in tax law, was a partner located in E&Y's Washington, D.C. office.  COPLAN worked within the PFC section of National Tax, and was one of E&Y's "subject matter experts," or "SMEs,"  in the areas of personal income taxes, estate and gift taxes, and excise taxes. COPLAN, who was the National Director of E&Y's Center For Family Wealth Planning, was a member of the VIPER/SISG group from its inception in or about early 1998. For most of the next several years, COPLAN supervised the activities of the group.  Among his other activities, COPLAN approved promotional materials, and ensured that essential information about the design and implementation of E&Y's tax shelters was shared throughout the PFC practice.  He consulted regularly with defendants MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, and also participated in sales presentations to clients.  Before his employment at E&Y, COPLAN had worked for the IRS as a Branch Chief in the Legislation and Regulations Division.

8.      At all times relevant to this Indictment, defendant MARTIN NISSENBAUM, a lawyer with a Master's Degree in tax law, was a partner at E&Y. Located in E&Y's New York office, NISSENBAUM was a member of the PFC group within National Tax, and was a subject matter expert in the areas of individual income taxation, retirement benefits and compensation. NISSENBAUM was the National Director of E&Y's Personal Income Tax and Retirement Planning practice, and was a member of the VIPER/SISG group from its inception. Among other things, NISSENBAUM worked closely with defendants ROBERT COPLAN and RICHARD SHAPIRO in evaluating and developing the various tax shelters marketed by the group, and participated in sales presentations to clients and prospective clients.

9.      At all times relevant to this Indictment, defendant RICHARD SHAPIRO, a lawyer with a Master's Degree in tax law, was a partner located in E&Y's New York office. SHAPIRO was a subject matter expert in the taxation and structuring of financial products and instruments. Although he was not a formal member of National Tax or the VIPER/SISG group until 2000, SHAPIRO worked regularly with the group from its inception in or about early 1998. SHAPIRO worked closely with defendants ROBERT COPLAN and MARTIN NISSENBAUM in evaluating the shelters marketed by the group. Because of his background and expertise in financial instruments, he played an essential role in the approval process of several of the group's shelters. He also participated in sales presentations to clients and prospective clients. Before his employment at E&Y, SHAPIRO had been the Director of Tax for the Financial Services Industry Practice at another large accounting firm.

10.     At all times relevant to this Indictment, defendant BRIAN VAUGHN -- who had a college degree in accounting – was a certified public accountant (CPA) and a certified

financial planner (CFP).  After working at three other major accounting firms, VAUGHN joined

E&Y as a senior manager in 1998.  As a member of the VIPER/SISG group from its inception

through at least 2001, VAUGHN led sales efforts for most of the SISG shelters, and also played a

development role.  VAUGHN was promoted to partner in or about 2002, in large part based upon

his role in successfully developing and marketing E&Y's tax shelters.

   11. Defendant DAVID L. SMITH was a lawyer with a master's degree in

business administration (MBA) and a CPA.  During the period from approximately 1978 through

1996. he worked at several major accounting firms and brokerage houses, where he helped

design and develop various tax strategies and tax shelters.  In 1997, SMITH joined an investment

advisory firm, where he developed, marketed and implemented tax shelters, including CDS.

SMITH left that firm in 1998, and soon afterward co-founded the Private Capital Management

Group ("PCMG").  PCMG marketed and implemented tax shelters, including CDS.  While at

PCMG, SMITH – who was the 50% owner of the company – marketed and implemented CDS

with the E&Y defendants, as well as with defendant CHARLES BOLTON.  SMITH also assisted

the E&Y defendants and BOLTON in marketing the CDS Add-On shelter in 2000.  During the

period from 1999 through 2000, SMITH earned millions of dollars from his involvement in

CDS

   12. From in or about 1999 through at least in or about 2006, defendant

CHARLES BOLTON owned and operated a group of companies ("the Bolton companies") that

implemented and assisted in implementing tax shelters for E&Y's clients.  BOLTON – who

studied business finance in college – held a series of finance jobs during the period from 1983

through 1992.  In 1992, BOLTON formed the first of his own companies, Bolton Financial

Services.  In or about mid-1999, BOLTON met defendant DAVID L. SMITH, and soon

afterward began to assist SMITH in implementing CDS for E&Y's clients.  In or about early

2000. BOLTON arranged for one of his companies to license the CDS idea from SMITH.

BOLTON thereafter assisted in further developing and implementing CDS, together with E&Y.

In or about mid-2000, BOLTON agreed to assist the E&Y defendants in marketing and

implementing the CDS Add-On shelter.  During the period from 1999 through 2002, BOLTON

made millions of dollars from his involvement in CDS and CDS Add-On.

### Tax Shelter Fraud

13.     During the period from in or about 1998 through in or

about 2006, the defendants, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD

SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH and CHARLES BOLTON, and others known

and unknown to the Grand Jury (hereinafter "the co-conspirators"), participated in a scheme to

defraud the IRS by designing, marketing, implementing and defending tax shelters using means

and methods intended to deceive the IRS about the bona fides of those shelters, and about the

circumstances under which the shelters were marketed and implemented.

14.     The defendants and their co-conspirators designed, marketed,

implemented and defended these tax shelters so that wealthy individuals with taxable income

generally in excess of $10 or $20 million could eliminate or reduce the individual income taxes

they would have to pay to the IRS.  As designed, marketed and implemented, instead of wealthy

clients paying U.S. individual income taxes that were legally owed (generally, between 20% and

40% of their taxable income), the clients could pay total costs calculated largely as a percentage

of the desired tax loss or deduction generated by the particular tax shelter.  These costs included

the fees payable to E&Y and the other participants, including PCMG, the Bolton companies, the various law firms that supplied opinion letters to the clients, and the banks and other financial institutions that executed the transactions.  The costs also included an amount that would be used to execute purported "investments," which were designed, in part, to disguise and conceal the true nature and purpose of the tax shelters.

15.    The defendants and their co-conspirators understood that if the IRS were to detect the clients' use of these tax shelters, and learn the true facts and circumstances surrounding the design, marketing and implementation of these shelters, the IRS would aggressively challenge the claimed tax benefits.  In that event, the IRS would seek to collect the unpaid taxes plus interest, and might also seek to impose substantial penalties upon the clients. Accordingly, the defendants and their co-conspirators undertook to prevent the IRS from: a) detecting their clients' use of these shelters; b) understanding how the steps of the transactions operated to produce the tax results reported by the clients; c) learning that these shelters were marketed as cookie-cutter products that would eliminate, reduce or defer large tax liabilities; d) learning that the clients had not undertaken these transactions because they were seeking profit-making investment opportunities, but had instead done so because they were seeking huge tax benefits; and e) learning that, from the outset, all the clients intended to complete a pre-planned series of steps that had been designed by the conspirators to lead to the specific tax benefits sought by the clients.

16.    In order to maximize the appearance that the tax shelters were investments undertaken to generate profits, and to minimize the likelihood that the IRS would learn the transactions were actually designed to create tax losses and deductions, the defendants

and their co-conspirators created, assisted in creating, and reviewed transactional documents and other materials containing false and fraudulent descriptions of the clients' motivations for entering into the transactions, and for taking the various steps that would yield the tax benefits. They also carefully protected internal documents and promotional materials that set forth the tax benefits and pricing schedules of the various shelters against disclosure to the IRS. The conspirators' goal of deceiving the IRS into believing that the tax shelters were driven by investment objectives rather than tax savings objectives was demonstrated in an email sent by defendant ROBERT COPLAN to a PFC professional in 2001. That individual had prepared a proposed client solicitation letter, in which he provided short descriptions of various SISG strategies and their accompanying tax benefits. COPLAN expressed reservations about sending such a letter to clients, as the IRS would inevitably ask the clients for marketing and promotional materials in the course of any audit. COPLAN explained, "Since our ultimate goal is to make our strategies appear to be investment techniques that have advantageous tax consequences, letters like this are not helpful to the client's case[.]"

17.    The law in effect at all times relevant to this Indictment provided that if a taxpayer claimed a tax benefit by using a tax shelter, and that benefit was later disallowed, the IRS could impose substantial penalties upon the taxpayer -- ranging from 20% to 40% of the underpayment attributable to the shelter -- unless the claimed tax benefit was supported by an independent opinion, reasonably relied upon by the taxpayer in good faith, that the tax benefit "more likely than not" would survive IRS challenge. In order to encourage clients to participate in the shelters, and to shield the clients from possible penalties, the defendants worked with law firms that agreed to provide E&Y's clients with opinion letters that claimed the tax shelter losses

or deductions would "more likely than not" survive IRS challenge, or "should" survive IRS challenge. However, the defendants knew those opinions were based upon false and fraudulent statements, and omitted material facts. By helping their clients obtain false and fraudulent opinion letters, with the understanding and intent that those opinion letters would be presented to the IRS if and when the clients were audited, the defendants not only sought to undermine the ability of the IRS to ascertain the clients' tax liabilities, but also sought to undermine the ability of the IRS to determine whether penalties should be imposed.

18.    The defendants and their co-conspirators undertook these actions so that E&Y, PCMG, the Bolton companies and the other entities involved could participate in the highly lucrative tax shelter market in which other accounting firms and "investment advisory" firms were already participating; so that E&Y could prevent its high-net-worth clients from taking their business (including, potentially, the highly-prized audit business associated with some of these individuals) to its competitors; so that PFC – a business unit that was not a substantial contributor to the firm's revenues – could grow and prosper within the firm; so the individual E&Y defendants could enhance their own opportunities for professional recognition, advancement, job security, and remuneration; and so the Bolton companies could obtain access to E&Y's high net worth clientele for purposes of developing future business.

19.    In addition to implementing fraudulent tax shelters for E&Y's clients, in 2000, defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO implemented a tax shelter to evade their own taxes, and arranged for eight of their E&Y partners to participate in the transaction with them. Use of that tax shelter enabled the group of eleven E&Y partners to eliminate a total of approximately $3.7 million in taxes.

20.     In addition to implementing fraudulent tax shelters for E&Y's clients, in 2000 and 2001 defendant CHARLES BOLTON implemented fraudulent tax shelters to reduce and defer his own tax liabilities.  Use of those tax shelters enabled BOLTON to reduce his tax liabilities by millions of dollars.

### The Fraudulent CDS Shelters

21.     CDS (an abbreviation for "Contingent Deferred Swap") was marketed and sold by E&Y from mid-1999 through 2001.  During that period, approximately 69 CDS transactions were implemented for approximately 140 of E&Y's wealthy clients.  As designed and marketed, E&Y's fee for CDS was approximately 1.25% of the tax deductions to be generated for each client.  Various clients paid greater or lesser amounts, but ultimately the transaction generated more than $27 million in fees for E&Y.  Clients who implemented CDS also paid fees to other participants in the transaction, including at least 1.25% to PCMG (for CDS transactions implemented in 1999) or the Bolton companies (for CDS transactions implemented in 2000 and 2001), as well as a fee to Law Firm A for an opinion stating that if the IRS were to disallow the CDS tax benefits, the client "should" ultimately prevail (a "should opinion").  Typically, Law Firm A's fee was at least $50,000.

22.     The objective of CDS was to convert a client's ordinary income into long-term capital gains, and defer the client's tax liability from the year in which the income was earned ("Year 1") to the following year ("Year 2").  During the period when CDS was sold, ordinary income for very wealthy individuals was typically taxed at a rate of approximately 40%, while long-term capital gains were taxed at approximately 20%.  Accordingly, the conversion of

-10-

a client's income from the ordinary rate to the capital gains rate resulted in tax savings to the client of approximately 20% of their income. CDS was marketed to individuals or groups of individuals who had at least $20 million in ordinary income to shelter.

23.     Although there were variations, in a typical CDS transaction, the client sought to convert $20 million in ordinary income into capital gains. CDS was designed and implemented as a series of pre-determined steps intended to deceive the IRS by making it appear that the client was engaged in the business of currency trading for profit, and that the various component parts of the transaction were routine financial activities comprising a coherent business philosophy. The conspirators concealed the fact that CDS was mass-marketed to clients who had no genuine interest in putting their money at risk by engaging in the business of currency trading, but were instead merely carrying out steps they were told to carry out in order to achieve CDS's tax benefits. These steps, and the manner in which these steps were manipulated to deceive the IRS, included the following:

a)     The CDS strategy was implemented through the creation of a limited partnership in which an entity characterized as an investment advisor was the general partner and E&Y's client was the limited partner. Defendant DAVID L. SMITH's company, PCMG, was the general partner for the CDS partnerships set up in 1999. After CHARLES BOLTON licensed CDS from SMITH in early 2000, one of the Bolton companies -- Bolton Capital Planning ("BCP") -- became the general partner for the CDS partnerships set up in 2000 and 2001. Although the main purpose for creation of each CDS limited partnership was for the client to obtain tax benefits, and for E&Y, PCMG, and the Bolton companies to earn tax shelter fees, the documents created to execute the transaction described each partnership as a "trading

-11-

partnership," and made no mention of the tax benefits, but instead stated that the partnership was "organized to generate capital appreciation."

   b)  After determining how much ordinary income the client wished to shelter from taxes in Year 1, the conspirators would typically arrange for the client to contribute approximately one-third of that amount ($6.6 million in the typical example) to the purported "trading partnership."

   c)  The success of the client's tax position with the IRS required that the partnership be characterized for tax purposes as a "trade or business," so that "business deductions" could be generated, and then used by the clients to offset their taxable income.  Accordingly, the conspirators arranged for approximately $1 million of the client's $6.6 million contribution to be placed in a trading account.  In order to make it appear that the "trading partnership" was genuinely engaged in the "business of trading for profit," the funds in that trading account were generally used to carry out a high volume of short-term trades.  However, the activity in that account consisted largely of trades designed to preserve the client's capital, so the funds in the account could be returned to the client once the tax benefits of CDS had been obtained.  As described by a co-conspirator employed by one of the Bolton companies in an email to another co-conspirator, "Our true investment objective in the various trading accounts was minimal gains and losses."  As stated by the same co-conspirator in an email sent to defendant CHARLES BOLTON and others,  "I am happy to report that ... [f]or the most part we were down an average of approximately 1% on all of the trading accounts.  In my eyes, that is 100% in line with what our objective was."  The conspirators affirmatively sought to conceal the fact that no trading profits were expected, as reflected in an email sent by another co-conspirator

-12-

in February 2000, asking that certain references be removed from CDS documents, and explaining, "We don't want to highlight that we don't anticipate trading profits."

        d)      A portion of the client's cash contribution to the "trading partnership" (approximately $5 million in the example) was put toward a $20 million swap contract, which was entered into between the partnership and a bank or financial institution ("the bank"). The swap contract called for the "trading partnership" to make periodic payments totaling approximately $20 million to the bank over the life of the swap. Because the payments made to the bank in Year 1 were made by an entity purportedly engaged in the "business" of trading, those payments were claimed by the partnership as "business deductions." The purported "business deductions" – which flowed through the "trading partnership" to the client – would be used to offset the $20 million in ordinary income earned by the client in Year 1, and thus would eliminate the client's tax liability that year.

        e)      In order for a CDS client to shelter $20 million in income, it was necessary, under the tax code, for that client to have $20 million "at risk" in the CDS transaction. In a typical transaction, only $5 million of the client's contribution was put toward the swap; the additional $15 million was obtained by the partnership as a purported "loan" from the bank. However, the so-called "loan" from the bank did not involve any actual disbursement of funds to the CDS partnership. Instead, the bank merely made a "book entry" indicating that loan proceeds were being deposited into a collateral account at the bank. The CDS swaps were structured so that no real funds were  transferred to the control of the partnership, and there was no possibility that any real funds of the bank would be placed at any risk of loss. Because the bank was at all times fully collateralized on the "loan," there was also no possibility of a default on the "loan" by

the partnership. The conspirators caused the CDS clients to execute documents by which they agreed to accept personal liability on the loans, while at the same time assuring the clients that they would not have to contribute any additional money to the transaction. In causing the clients to execute such documents, the conspirators sought to deceive the IRS into believing that the individual clients were actually "at risk" for the loan amounts. In truth and in fact, they knew that no such risk existed, that the so-called "loans" served no business purpose, and that the "loans" served only to increase the amount of the tax deduction the individual could claim. This tax purpose is reflected in a 1998 email concerning the CDS transaction, sent between employees of the bank that executed the 1999 CDS transactions for E&Y's clients:

> You are right to say that the collateral is part funded out of our loan and, to that extent, seems non-sensical, but there is a tax reason why this circularity is necessary. . . . (You will recall that the purpose of the trade is to convert current income into long-term capital gains.) . . . Incidentally, this "loan" has zero capital implications for the bank.

      f)    The CDS swap contract also provided for a "termination payment" to be paid by the bank to the CDS partnership in Year 2, at the end of the swap. For a $20 million swap, the termination payment was approximately $20 million, with some variation based on market fluctuation. In order for the termination payment made to the CDS partnership to qualify for long-term capital gains treatment, the swap termination in Year 2 had to occur more than a year after the swap was executed, and had to be characterized as an "early termination" of the swap contract. Although prospective CDS clients were told by E&Y that the swaps would last for just over one year, the conspirators arranged for swap contracts to be drawn up with 18-month maturity dates. This was done to mislead the IRS into believing that the

-14-

parties actually contemplated an 18-month swap, and that "early termination" was an option, but not a foregone conclusion. The conspirators sought to conceal this plan from the IRS, as reflected in an email sent by defendant BRIAN VAUGHN to a co-conspirator in June 2001. In that email, VAUGHN suggested removing reference to "early termination" from a CDS economic model, explaining, "This could adversely affect our tax situation given the level of audits that are currently in progress. . . . Remember our goal is to convince the agents the client did not have a predisposition of early termination." For a similar reason, defendant RICHARD SHAPIRO recommended against use of an internal E&Y document called a "CDS Action Plan," which set forth all the steps of the transaction in advance, including early termination of the swap. In an email SHAPIRO sent to defendants ROBERT COPLAN, MARTIN NISSENBAUM and BRIAN VAUGHN, he explained:

> [O]ne of the problems with tax advantaged transactions when they are viewed is that they are perceived (correctly I might add) as too scripted. While having a plan is important, should we have in writing 'before the fact' such things as the fact that our swap will be terminated early? Clearly, that is necessary for the flow of the transaction. But should there be a document in existence (such as this) that has all the chapters and verses laid out? I question that seriously.

Thus, by manipulating the terms of the swap and by concealing the genuine intentions of all the parties, the conspirators concocted a scenario that enabled them fraudulently to characterize the termination payments received by the CDS partnerships from the bank as long-term capital gains. Those capital gains flowed through the partnerships to the clients, so the clients could be taxed at the lower, capital gains rate.

24.     As part of the scheme to defraud the IRS, the conspirators created additional documents that purported to provide non-tax business motivations for steps that were actually tax-motivated. For example, defendant ROBERT COPLAN drafted a letter to be signed by clients who had decided to terminate their CDS partnerships after the tax benefits had been obtained. In that letter, the clients falsely attributed their decision to discontinue their trading activities to the September 11, 2001 terrorist attacks, and to "possible economic repercussions resulting from such attacks." In an email sent to various members of E&Y's PFC practice, as well as to defendants MARTIN NISSENBAUM and RICHARD SHAPIRO, COPLAN attached his draft letter, and explained that the letter could be used "as a means of establishing a logical reason for winding down the trading account in the partnership. . . . This could document for the file a logical non-tax rationale for ending the trading account – if that is otherwise what the client wants to do." A copy of COPLAN's email and the attached letter was forwarded to defendant CHARLES BOLTON.

25.     As part of executing the fraudulent CDS tax shelters, the conspirators arranged for CDS clients to sign false factual representations that could be, and were, incorporated into the CDS opinion letters prepared by Law Firm A. For example, although the real purpose of the CDS trading activity was to achieve a particular volume and frequency of trading so the conspirators could plausibly characterize the CDS partnerships as involved in a "trade or business," and could thereby assert that the swap payments made by the partnerships in Year 1 were "business deductions," the CDS clients were directed to sign, and did sign, a document stating, "I regard the various investments of the partnership -- including the swaps and the trading activities -- as comprising one coherent business philosophy, and this diversity of

-16-

investments was an important element in my decision to invest in the partnership." In truth, as the conspirators well knew, the diversity of investments was not an important element in the clients' decisions, and the only "coherent philosophy" reflected in the various components of the CDS transaction was a philosophy to reduce taxes.

26.    In addition to incorporating the false factual representations described in paragraph 25, above, the defendants and their co-conspirators caused Law Firm A to issue opinion letters which they knew contained false and fraudulent statements and omitted material facts, including but not limited to the following:

a)    The opinions stated that the objective of the partnership's trading activities was to "profit from short term market movements," when in reality, the primary objective of the trading activity was to achieve a particular volume and frequency of trades, while preserving the client's capital by minimizing trading losses.

b)    The opinions stated that because either party to the swap contract could elect to terminate the swap early, the partnership was "not in control of that decision, should it occur," and therefore the partnership should not be viewed as "being able to manipulate the timing of income," when in reality, both parties to the swap contracts planned to terminate the swaps early from the outset, and the sole purpose of that plan was to manipulate the timing of income.

c)    The opinions stated that the limited partner (the client) was "at risk" for an amount greater than the amount invested because the client had agreed to be personally liable for the debts of the partnership, when in reality, the clients had been assured that they would not be liable for any amount over their initial cash contribution, and the transaction

-17-

was arranged so there would be no such liability.

        d)      The opinions stated that "[n]one of the business conducted by the Partnership [had] a predetermined outcome," when in reality, the E&Y defendants and their co-conspirators had marketed to E&Y's clients, and the clients had paid fees to obtain, a strategy consisting of a pre-planned series of steps leading to a predetermined tax benefit.

        e)      The opinions did not disclose that the client's primary purpose for implementing the CDS transaction was to obtain the tax benefits, or that the fees associated with the transaction were calculated on the basis of the intended tax deduction to be generated.

        f)      The opinions did not disclose that they were rendered by an attorney who had assisted the defendants in designing, marketing, and implementing the CDS transaction, and had been offered to the clients as part of a promotional package.

### The Fraudulent COBRA Shelters

      27.      COBRA (an acronym for "Currency Options Bring Reward Alternatives") was marketed and sold by E&Y during the last few months of 1999 to 51 wealthy taxpayers. Of the 16 COBRA transactions, all but one were implemented in late 1999; the other was implemented in 2000. Although some clients paid greater or lesser amounts, as designed and marketed, E&Y's fee was approximately 1.5% of the tax losses to be generated using the strategy, and COBRA generated approximately $14.7 million in fees for E&Y. The fees paid by COBRA clients amounted to approximately 4.5% of the losses to be generated, including a fee of just under 3% charged by the law firm of Jenkens & Gilchrist ("J&G"). J&G prepared most of

-18-

the transaction documents for the COBRA shelters, and implemented the COBRA transactions for the clients. J&G also issued "more likely than not" opinion letters to the COBRA clients. Defendants ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN realized that because J&G was involved in designing, structuring and implementing the transaction, the clients would not be able to obtain penalty protection on the basis of J&G's opinion letter. Therefore, the E&Y defendants arranged for another attorney, a partner at Law Firm B, to issue each of the COBRA clients a second "more likely than not" opinion for a fee of up to $150,000.

28.    The objective of COBRA was the complete and permanent elimination of all tax liability on whatever amount of ordinary income or capital gain a client might choose. COBRA, which involved the manipulation of basis in digital foreign currency options, was E&Y's brand of a strategy also known as the "digital option trade" or the "short option strategy."

29.    COBRA was designed, marketed and implemented as a series of pre-planned steps which, within a period of 30 to 45 days, would generate artificial losses sufficient to offset a client's income or gains completely. COBRA was intended to deceive the IRS by making it appear that the client – together with other like-minded individuals – was "investing" in foreign currency options in order to make a profit, and that non-tax business reasons existed for the various steps of the transaction. In reality, in exchange for substantial fees that were calculated largely as a percentage of the tax loss to be generated for E&Y's clients, the E&Y defendants and their co-conspirators provided the clients with a cookie-cutter transaction that utilized pairs of almost completely offsetting foreign currency options to generate huge artificial tax losses. Although the options had some chance of earning the clients a profit after the fees

were paid, this so-called "investment" opportunity was not offered generally through E&Y's Investment Advisory Service, but was instead marketed to a select group of individual clients with more than $20 million in income or gains to offset.

30. COBRA included the following key steps:

a) The client would identify an amount of ordinary income or capital gains on which the client wished to eliminate taxes. The client or E&Y would then identify other individuals who also wished to eliminate their taxes, with whom the client could participate in the transaction.

b) Using J&G, each client would create a wholly-owned limited liability company ("LLC"). That LLC would purchase a digital foreign currency option (the "long option") from a bank, and would sell an almost completely off-setting digital foreign currency option ("the short option") to the same bank. The client's LLC paid a net amount to the bank for the pair of options; that amount equaled 5% of the tax loss the client wished to generate (in other words, 5% of the income the client wished to offset).

c) The pair of offsetting options constituted a single financial bet between the client and the bank that, at the end of 30 days, a particular currency would have gone up or down in value against another currency by a specific amount. The option pairs were priced and structured by arrangement between E&Y and the bank so that if the client won the bet (or, was "in the money") at the end of the 30-day period, the bank would pay the client an amount sufficient to yield a profit over and above the client's initial 5% contribution plus the fees associated with the transaction. E&Y told its clients that the odds of that happening were approximately 38%. If the client lost the bet (or, was "out of the money") after 30 days, then the

client would lose his 5% contribution and his fees. E&Y told its clients that the likelihood of that outcome was approximately 62%. Thus, the E&Y defendants and the clients knew from the outset that the clients would probably lose their 5% contribution and their fees.

d)      Almost immediately after acquiring the option pair or pairs from the bank, each client – acting through his newly created LLC – would contribute the option pairs to a newly created partnership, also formed by J&G, in which one or more other COBRA clients were also partners. After approximately 30 days, the options would expire. Each client would also contribute a low-value asset to the partnership – an ordinary asset or a capital asset, depending on whether the client desired ordinary or capital losses.

e)      Each client would then transfer his partnership interest to a new S-Corporation, also formed by J&G. When this occurred, the partnership would automatically terminate. According to the E&Y defendants and their co-conspirators, each client could then claim – for tax purposes – that his tax basis in the partnership was equal to the cost of the long option (which had been calculated intentionally to equal the income the client wished to offset), rather than the net amount actually paid by the client to participate in the transaction (5% of the price of the long option). The conspirators claimed that the low-value asset contributed by the client to the partnership would take on that high tax basis when the partnership terminated, so that when the S-Corporation sold the low-value asset at fair market value only days later, a huge artificial loss – equal to almost twenty times the client's initial cash contribution – was created for the client.

31.      The E&Y defendants and their co-conspirators were aware that if the IRS were to discover all the facts surrounding the design, marketing and implementation of COBRA,

and that the COBRA clients were primarily or exclusively motivated by a desire to eliminate huge tax liabilities, the IRS would aggressively challenge the claimed tax benefits. Accordingly, among other steps they took to prevent the IRS from learning those facts, the conspirators: 1) falsely and misleadingly represented the COBRA clients' motivations for entering into the transaction, and for taking the various steps necessary to create the huge artificial losses; 2) encouraged COBRA clients to engage in activities designed to disguise and conceal their tax motivations for entering into the transaction; 3) falsely represented to the IRS the likelihood that clients could earn a profit from COBRA; 4) directed the destruction of documents which would reveal the true facts surrounding the design, marketing and implementation of COBRA; 5) caused and approved the issuance of false and fraudulent opinion letters; and 6) misled the IRS during audits of the COBRA transaction.

   32. Among the ways in which the conspirators sought to conceal the fact that COBRA was tax-motivated, and was designed and implemented as a pre-planned series of steps, were the following:

    a) Defendant ROBERT COPLAN directed that client engagement letters make no reference to tax losses, or to the fact that fees were calculated as a percentage of the tax losses the clients sought to generate.

    b) Defendant ROBERT COPLAN directed that PowerPoint presentations which laid out all the steps of the COBRA transaction not be left with clients.

    c) In addition to having clients contribute 5% of the desired loss amount to the transaction, the E&Y defendants directed clients to contribute an additional 2% of the desired loss amount to the COBRA partnerships, and recommended using that additional cash

to engage in trading activity.  The sole purpose of that trading activity was to deceive the IRS into believing that the COBRA partnerships had been formed to conduct investment activities, and not merely to generate tax losses.  The E&Y defendants' intent to deceive the IRS in this regard was reflected in a series of emails sent by defendant ROBERT COPLAN to various PFC members whose clients had initiated COBRA transactions, as well as to defendants RICHARD SHAPIRO, MARTIN NISSENBAUM and BRIAN VAUGHN.  COPLAN explained in the first email, "[T]he more trading activity the better [because] the trading activity is important to the maintenance of a business purpose for the partnership."  In a later email he advised, "Trades should occur weekly in the partnership, with weekly turnover of positions at or near 100% . . . . The tax position will be aided if there is at least some type of trading activity[.]"

        d)      Defendant ROBERT COPLAN sent an email to PFC professionals, with a copy to defendants RICHARD SHAPIRO, MARTIN NISSENBAUM and BRIAN VAUGHN, suggesting that their COBRA clients download foreign currency trading information from a website, and explaining that such material could be useful "as file material to evidence investigation into currency trading."

        e)      After the COBRA partnerships terminated in late 1999, and after the artificial losses had been generated, the E&Y defendants recommended that clients maintain the 2% cash contribution in their S-Corporations, and continue to engage in trading activities.  This step was designed to deceive the IRS into believing that the S-Corporations had been created for some actual business purpose, instead of simply to achieve COBRA's tax benefits.  In an email to PFC professionals in January 2000, defendant ROBERT COPLAN stated that he, together with defendants MARTIN NISSENBAUM and RICHARD SHAPIRO, were "providing

guidance . . . as to what is recommended to strengthen the client's tax position[.]"  COPLAN continued:

> It is preferable to leave the S Corp in place through the end of the year 2000 to enhance the substance of the transaction – i.e., so that the entire structure is not closed down within two months. . . . As for activity in the account we believe 'The more the better' [because] the tax position will be strengthened by significant trading activity . . . .

With respect to the S-Corporation, COPLAN explained to another PFC member, "The longer it runs, the better it looks from a business standpoint as to why the thing was formed."

      f)      After the IRS began auditing COBRA clients, defendant ROBERT COPLAN sent an email to PFC professionals throughout the country, directing that they destroy COBRA documents.  The email was titled "Important - Purge Of All Key COBRA Documents," and it instructed that recipients "immediately delete and dispose of" COBRA documents such as PowerPoint slides and work plans.

      33.      As part of the COBRA client's fees, the client received two "more-likely-than-not" opinion letters, one from J&G, and the second from Law Firm B.  The E&Y defendants and their co-conspirators knew that these opinion letters contained false and fraudulent statements, and omitted material facts.

      a)      J&G's opinions were false and fraudulent for the following reasons, among others: i) they stated that the clients had made factual representations to J&G concerning their reasons for entering into the transaction, when in reality, no such factual representations had been made to J&G; ii) they stated that the clients had contributed their foreign currency options to the COBRA partnerships for "substantial non-tax business reasons,"

when in reality, there were no substantial non-tax business reasons for that step, and the clients took that step because the conspirators directed them to do so; and iii) they stated that the clients had contributed their partnership interests to the S Corporations for "substantial non-tax business reasons," when in reality, there were no substantial non-tax business reasons for that step, and the clients took that step because the conspirators directed them to do so.

        b)      Law Firm B's opinions were false and fraudulent for the following reasons, among others: i) they stated that the clients had contributed their foreign currency options to the COBRA partnerships for "substantial non-tax business reasons," when in reality, there were no "substantial non-tax business reasons" for that step, and the clients took that step because the conspirators directed them to do so; ii) they stated that the clients had contributed their partnership interests to the S Corporations for "substantial non-tax business reasons," when in reality, there were no "substantial non-tax business reasons" for that step, and the clients took that step because the conspirators directed them to do so; and iii) they stated that "there existed no understanding, obligation or agreement" under which the clients committed to undertake the various steps in the COBRA transaction, when in reality, the COBRA clients had been told they could obtain the promised tax benefits only if all the steps were completed, and therefore the clients intended to complete them.

        c)      The J&G opinions purported to be based upon "all the facts and circumstances necessary" for J&G to form its opinion, and Law Firm B's opinions purported to be based upon all "pertinent facts."  However, the J&G opinions failed to disclose that J&G had implemented the COBRA transaction on behalf of the clients, and that J&G had collected as its fee a percentage of the loss amount generated.  In addition, neither opinion disclosed the

-25-

following material facts, among others: i) that most of the COBRA clients responded to a promotional pitch that emphasized COBRA's tax benefits, and they entered into the transaction primarily or exclusively to obtain those tax benefits; ii) that the clients knew from the outset that a particular series of steps would be undertaken, for a given fee, leading ultimately to a specific tax result; iii) that COBRA was structured so that each client would probably lose his entire cash contribution plus fees, rather than make any profit; and iv) that the "more likely than not" opinion letters had been offered to the clients as part of E&Y's promotion of the shelter.

34.     On or about January 5, 2000, E&Y's management decided that E&Y would no longer market COBRA to its clients.  That decision was reached after subject matter experts outside the VIPER/SISG group expressed the view that COBRA would not survive scrutiny under applicable law.  Among the objections raised by others within E&Y was that COBRA did not have a meaningful "business purpose."

### The Fraudulent CDS Add-On Shelters

35.     CDS Add-On, which involved adding a COBRA-like transaction onto a CDS transaction, was marketed for a brief period in mid-2000.  Approximately 61 wealthy individuals took part in a total of 37 Add-On transactions, which generated more than $24 million in fees for E&Y.  CDS Add-On was implemented by defendant CHARLES BOLTON through the Bolton companies, and generated millions of dollars in fees for BOLTON and the Bolton companies.  In addition to the fees paid to E&Y, the Bolton companies, and other participants in the transactions, clients paid $75,000 for a "more likely than not" opinion letter from Law Firm A.

-26-

36.    The objective of CDS Add-On was for the client to defer indefinitely the income tax liability on the capital gains generated in the second year of the CDS transaction. In most cases, CDS Add-On consisted of two parts: 1) a two-year CDS transaction that would result in capital gains to the CDS partnership; and 2) a COBRA-like strategy that would generate artificial losses for the CDS partnership, and thus offset those capital gains.  However, unlike in COBRA, the losses generated using CDS Add-On did not permanently eliminate taxes, but instead resulted in a tax deferral for as long as the income to be sheltered remained in the hands of the partnership.

37.    The second part of the transaction (the COBRA-like structure, referred to as the "Add-On") was implemented by having each participating CDS partnership acquire one or more pairs of almost completely off-setting digital foreign currency options.   As in COBRA, the premium for the long options equaled the amount of income the client wished to offset.  Thus, each client's partnership could acquire options that would offset the capital gains received in the second year of CDS, or the partnership could acquire options with a higher premium, and thereby shelter additional income or gains.  Participating partnerships would then contribute their option pairs to a new entity, BCP Trading & Investments, LLC ("BCPT&I"), which was created by defendant CHARLES BOLTON and was used solely to implement the Add-On shelter.  By contributing their option pairs to BCPT&I, the CDS partnerships became members of BCPT&I. Before the end of the tax year in which the client wanted to shelter their CDS capital gains (Year 2 of the CDS transaction), the CDS partnership would withdraw from BCPT&I, and would receive foreign currency which – as in COBRA – took on an artificially inflated tax basis.  The CDS partnership would then sell or exchange the foreign currency to trigger a loss equal to the

-27-

capital gain from the CDS swap termination payment, or such larger amount as the client had chosen. The client's taxes would be deferred until cash was removed from the CDS partnership, or until that partnership terminated.

38.     Like CDS, the Add-On transaction also involved a so-called "loan" from a financial institution. Just as the "loan" made to the partnership in CDS involved no genuine transfer of funds and served no purpose other than to generate tax benefits, the "loan" extended to the Add-On clients was also made with a "book entry" and served no purpose other than to assist the clients in claiming artificial tax losses.

39.     The idea for CDS Add-On arose in or about early May 2000, after a similar idea was described to defendant BRIAN VAUGHN. VAUGHN passed the idea to defendant ROBERT COPLAN in an Instant Message ("IM"), stating, "If we could integrate CDS and the foreign currency trading program with the short option transaction, we could have a great transaction." COPLAN responded that he would consider VAUGHN's proposal, and forwarded the IM to defendants MARTIN NISSENBAUM and RICHARD SHAPIRO.

40.     During the next several weeks, the E&Y defendants developed the Add-On strategy, and obtained the participation of defendant CHARLES BOLTON. The E&Y defendants were well aware that only a few months earlier, E&Y's management had decided that COBRA would no longer be marketed by E&Y, and that others within E&Y would oppose the Add-On strategy unless it had a more meaningful business purpose than COBRA. In order to provide the Add-On strategy with such a "business purpose," and thus to obtain approval to market Add-On, the E&Y defendants created a false cover story: they claimed that the idea for the CDS partnerships to purchase the digital foreign currency options, and the idea to consolidate

those options in a new LLC, had come from one of the traders who was managing activity in the CDS partnership trading accounts on behalf of BCP, and that the purpose of those steps was "to diversify trading and enhance performance" in the trading accounts. They also falsely claimed that the plan to take those steps had been presented to them by defendant CHARLES BOLTON, and that they had merely recognized the favorable tax consequences that could be obtained. According to defendant ROBERT COPLAN, these events were simply a "fortuitous circumstance."

41.     In reality, there was no way the Add-On transaction could "enhance performance" in the CDS trading accounts. Unlike the COBRA transaction, which entailed a foreign currency bet that could actually result in a profit for the client if the client's option pair ended up "in the money," no such possibility existed for the Add-On transaction. This was because the Add-On client was required to contribute only about 0.5% of the desired loss amount to the Add-On transaction (as opposed to 5% contributed by the COBRA client). Although the payout on a successful Add-On bet was 2:1, any profit potential on such a payout was far exceeded by the amount the client was required to pay in fees to E&Y, the Bolton companies, Law Firm A and the financial institution involved. Thus, the Add-On transaction carried no reasonable possibility of profit; it served no purpose other than to defer the client's tax liability indefinitely, and to generate fees for the other participants.

42.     The conspirators agreed, with respect to the marketing of Add-On, that PCMG (the general partner of the CDS partnerships set up in 1999) and BCP (the general partner of the CDS partnerships set up in early 2000) would send letters to the CDS clients, announcing the opportunity to participate in a new "program" that would diversify their trading returns and

enhance performance.  Defendant DAVID L. SMITH signed the letters sent on behalf of PCMG, and Belle Six – a co-conspirator not named as a defendant herein, who served as a Managing Director of BCP – signed the letters sent on behalf of BCP.  Defendant ROBERT COPLAN also drafted a letter to be sent to the CDS clients by E&Y.  In that letter – which was sent to defendants MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN and CHARLES BOLTON to review and edit – COPLAN also referred to BCP's desire "to diversify trading and enhance performance."  As COPLAN explained in an email to the E&Y defendants, he deliberately drafted the letter in such a way as to conceal the fact that withdrawal from the BCPT&I – a step necessary to generate the artificial losses that would defer the client's taxes – was planned from the outset: "I softened the last reference to the liquidation of the interest in the LLC so it sounds less like an event that we know will happen in the near future."  These letters were prepared in anticipation of possible future audits, in order to deceive the IRS into believing that the transaction was motivated by investment concerns, and that the steps leading to the tax result were not pre-planned from the outset.

43.    In order for the many steps of the Add-On shelter to be implemented efficiently for all the CDS clients who wished to participate, defendant DAVID L. SMITH agreed to transfer from PCMG to BCP the control of all 1999 CDS partnerships whose limited partners wished to participate in Add-On.  This was accomplished through three agreements executed in July 2000, all of which were signed by both SMITH and defendant CHARLES BOLTON.  BCP thereafter served as the general partner for all the CDS partnerships that implemented Add-On shelters, and ensured that all the necessary steps were executed on behalf of each one.

44.    During the marketing of CDS Add-On in 2000, the E&Y defendants took additional steps to ensure that the true motivation behind the strategy was not revealed. A PowerPoint presentation was created by an individual outside the VIPER/SISG group, to illustrate the inter-relationship between CDS and CDS Add-On, and it was distributed to PFC personnel. In a series of emails that followed, defendant ROBERT COPLAN expressed concern that the PowerPoint presentation would undermine the story the conspirators had constructed to establish a business purpose for the strategy, and would thus reveal the tax motivation behind it:

a)    On June 14, 2000, COPLAN sent an email to defendants BRIAN VAUGHN and RICHARD SHAPIRO, explaining that the Add-On strategy would "lose all of its business purpose if it is reduced to steps in a PowerPoint slide. The tax objective will appear to be the driving force rather than the money manager's interest in consolidating the accounts."

b)    The same day, COPLAN sent an email to all the PFC personnel who had received the PowerPoint presentation, stating that the slides were for internal use only, and were not to be shown when presenting CDS to clients. COPLAN cautioned, "There should be no materials in the client's hands – or even in their memory – that describe CDS as a single strategy that includes the Add-on feature."

c)    COPLAN then wrote to the individual who had prepared the PowerPoint slides:

> I hope you can understand the problem with portraying the strategy
> as an integrated transaction designed to produce a capital gain
> deferral. If these slides ever made their way to the IRS . . . the
> entire business purpose argument that gives us the ability to
> distinguish this from COBRA would be out the window. Since we

-31-

got the internal OK to do this add-on feature on the basis that there
is a much stronger business purpose than we had with COBRA,
doing anything to undermine that business purpose would be
creating unnecessary risk for our clients and unnecessary risk for
the PFC practice.

45.     In an email to defendant ROBERT COPLAN, defendant RICHARD
SHAPIRO also expressed his concern about linking the two strategies, stating, "I remain
concerned of the formal pre-wired tie-in to cobra. I think it adversely impacts the story that we
can tell regarding the purpose of the transaction."

46.     In addition to offering the Add-On shelter to partnerships that had been
created in order to participate in CDS, the E&Y defendants offered Add-On to several existing
entities that were genuinely engaged in the business of trading options, but which had not
participated in the CDS tax shelter. Representatives of these entities met with E&Y personnel,
and were offered the opportunity to reduce and defer the owners' income tax liabilities by
acquiring pairs of digital currency options, which would ultimately be contributed to BCPT&I,
together with the digital option pairs acquired by the CDS partnerships. Several such entities
agreed to participate.

47.     In July and August 2000, after pairs of digital options were acquired for
the various Add-On participants, defendant CHARLES BOLTON signed documents directing
that all the digital option pairs be transferred from accounts held by the CDS partnerships to an
account held by BCPT&I. BOLTON also caused the digital option pairs purchased by the
entities described in paragraph 46, above, to be transferred from accounts held by those entities
to the account held by BCPT&I.