# Exhibit A-2

48.    After the digital option pairs had all been transferred to BCPT&I,

additional steps were taken to further deceive the IRS about the reason the clients entered into

the Add-On transaction.  For example, in November 2000, the conspirators crafted a letter for

Add-On clients to submit to BCP, expressing either interest or disinterest in participating in a

"second round of digital option purchases."  In reality, there was no plan for BCP to engage in a

"second round of digital option purchases," and this letter was designed purely to create the false

impression that the decision of the particular Add-On clients to withdraw from BCPT&I or to

remain as members – a decision that would determine whether each client's artificial tax loss

would be triggered in 2000 or 2001 – was made for business reasons rather than tax reasons.  The

real purpose of the "second round of digital option purchases" letter is illustrated in emails sent

by defendant ROBERT COPLAN to PFC personnel whose clients had implemented Add-On

transactions, as well as to defendants MARTIN NISSENBAUM, RICHARD SHAPIRO and

BRIAN VAUGHN.  In an email dated November 8, 2000.  COPLAN explained:

> Belle Six has sent you a letter (sample below) intended for each of
> your CDS Add-On clients.  The letter mentions that the Bolton
> LLC into which the . . . trading account was transferred is
> considering doing a second round of digital option trading.  The
> client is offered the option of declining to participate in this digital
> activity, in which case he is to notify Bolton (Belle Six) by written
> reply, thereby triggering the termination of their partnership's
> interest in the LLC. . . .  Those of you advising clients whose CDS
> partnerships will remain active into 2001 to maintain deferral
> should be aware that the letter does not mean that [Bolton] will
> **actually** be investing in new digitals – only that they are
> **considering it.**

One recipient of COPLAN's email who was apparently unsure how to advise his client

responded:

-33-

> Our client ... is a CDS 2000 client (with add on) – we do not want
> to redeem the LLC interest and trigger the loss until 2001 (when
> the capital gain from the CDS 2000 will result).  Therefore, I
> assume that our client should not sign the letter (even though they
> are not necessarily interested in doing more digitals for investment
> purposes).  Correct?

COPLAN replied, "You are correct.  The only clients who should sign the letter are those who

want to be redeemed out of the LLC this year.  The fact that your client does not sign the letter

does not mean that more digitals will in fact be acquired."

       49.     Steps were also taken to conceal from the IRS the fact that the "loans"

purportedly extended in connection with the Add-On transaction were not real loans but were

instead "book entries" made so that the Add-On clients would have sufficient basis in their CDS

partnerships to deduct their Add-On tax losses.  After the financial institution that had

supposedly funded the "loans" provided a sample statement reflecting interest payments to and

from the partnerships, Belle Six, a co-conspirator not named as a defendant herein, commented

on the format of the statement in an email defendant CHARLES BOLTON and others within the

Bolton companies:

> I like that we have statements that show the date of the loan . . .;
> I like that we can see both interest earned/paid.  The thing that
> concerns me is that on one statement we are showing that we took
> out a loan that is 100% fully collateralized.  In other words, we
> have made it easy to ask the question, "What is the purpose of the
> loan?"  I have copied BV to ask his opinion.

Defendant BRIAN VAUGHN responded to Belle Six in an email she forwarded to BOLTON and

the others.  VAUGHN stated:

> I agree with your comments. The clients should love this format. It is
> very easy to follow. However, I don't think [the Law Firm A lawyer]
> would want to see this schedule nor the IRS. It clearly demonstrates the
> loan is used to obtain tax basis and not for investment. . . . Maybe if we
> could demonstrate the client is staying in "cash" for a short period of time
> . . . it would disguise the tax basis loan issue.

50.    In addition, with knowledge that the financial institution that extended the

so-called "loans" would not actually allow real funds to be used by the partnerships, defendant

CHARLES BOLTON sent a letter to the financial institution that was designed to conceal that

fact. By pre-arrangement with the financial institution, BOLTON's letter said:

> It is the intention of BCP to utilize the proceeds of these loans to invest in
> securities and trading strategies other than [financial institution's] paper.
> As such, we would like to inquire on [your] willingness to remove some of
> the restrictions that are currently in place with regards to the proceeds of
> the loan. It is the intent of BCP to handle each partnership on a case by
> case basis. Please let us know your decision on our request as soon as
> possible as it is our desire to move forward with these trading strategies
> promptly.

A representative of the financial institution then assisted in concealing that the loans were not

genuine by responding:

> I am in receipt of your letter dated February 16, 2001. Let me
> assure you that [financial institution] will be flexible as possible
> with transactions of the various CDS partnerships. We will review
> each request on a case by case basis. Please consider me as your
> point person for your requests and I will review each one
> personally.

51.    As part of executing the fraudulent Add-On tax shelter, the

conspirators arranged for Add-On clients to sign representation letters prepared by Law Firm A,

which contained false and misleading factual representations that could be, and were,

incorporated into Law Firm A's Add-On opinion letters. For example, each client signed a
document stating, among other things, that the client regarded the various activities of the
partnership – specifically including the client's "investment" in BCPT&I – as comprising "one
coherent business philosophy." In truth, as the conspirators well knew, the acquisition of the
digital option pairs and the contribution of those option pairs to BCPT&I was not an
"investment" at all, and was not part of any "coherent business philosophy."

52.    As part of executing the fraudulent CDS Add-On tax shelter, defendant
CHARLES BOLTON also signed representation letters prepared by Law Firm A, which
contained false and misleading factual representations that could be, and were, incorporated into
Law Firm A's opinion letters. For example, with knowledge that no genuine "loan proceeds"
were available for use by the partnerships that participated in Add-On, BOLTON signed
documents which stated:

> I intend to utilize Loan funds, as appropriate, to leverage the
> existing trading programs of the Partnership and/or invest in other
> programs, designed to yield returns in excess of the cost of funds
> while minimizing risk to capital, such as strategic investments in
> sovereign debt with manageable currency risk.

53.    In order to persuade the IRS that the tax results achieved through the Add-
On strategy were allowable, and to avoid the imposition of penalties on clients if the IRS were to
disallow those results, the defendants and their co-conspirators caused Law Firm A to issue
opinion letters which they knew contained false and fraudulent statements and omitted material
facts, including but not limited to the following:

-36-

a)    The opinions stated that "organization of the LLC was based upon probability analysis and engaging a well reputed expert in the largest and most active trading market in the world . . . in order to profit from a trading program," when in reality, BCPT&I was organized at the behest of the E&Y defendants, who recognized that the purported "trading program" carried no chance of generating a profit, but would generate tax benefits for the clients and fees for the conspirators.

b)    The opinions stated that "[n]one of the business conducted by the Partnership or the LLC [had] a predetermined outcome" and that "[n]one of the transactions . . . [were] prearranged or structured to yield a predetermined economic result," when in reality, E&Y had marketed to its clients -- and the clients had paid fees to obtain -- a strategy consisting of a pre-planned series of steps leading to a predetermined tax benefit.

c)    The opinions stated that the partnership's "decision to maintain an investment in the LLC or terminate such investment [was] no different than any other investment decision exhibited by the Partnership," when in reality, the partnership's decision to terminate its membership in BCPT&I was not an investment decision at all, but was based solely on the timing of desired tax losses.

d)    The opinions stated that the business purpose of BCPT&I was "asset appreciation," when in reality, the digital option pairs contributed to BCPT&I were likely to expire "out of the money," and they carried no practical possibility of a profit for the clients even if they expired "in the money."

e)    The opinions stated that the loan funds obtained in connection with the transaction would be used "to opportunistically invest in trading or other programs," and

-37-

accordingly, that the loan would likely be treated as a "genuine indebtedness."

   f)  The opinions failed to disclose that the purpose for entering into the Add-On transaction was for participating E&Y clients to obtain tax benefits, and that the fees associated with the transaction were calculated on the basis of the intended tax losses to be generated.

   g)  The opinions failed to disclose that they were rendered by an attorney who had assisted the defendants in designing and implementing the transaction, and therefore were not independent.

### The Fraudulent PICO Shelters

   54.  PICO was marketed and sold during 2000 and 2001. E&Y implemented approximately 96 PICO transactions for approximately 150 wealthy individuals. E&Y generated more than $56 million in fees from PICO, charging its clients approximately 2% of the tax losses the clients sought to generate. Each PICO client was provided with a "more likely than not" opinion letter from one of two law firms, Law Firm C and Law Firm D; the fees for those letters ranged between $50,000 and $100,000, depending on the size of the transaction.

   55.  The objective of PICO was to defer taxation and, in some cases, to convert ordinary income into capital gains, thus reducing the client's tax rate. Within a period of a few months, a PICO client would follow a pre-planned series of steps, and generate artificial losses that could be used to defer taxes indefinitely on the income the client wanted to shelter.

56.   PICO included the following essential steps:

a)   A client seeking to defer tax liability would form an S-Corporation (a "Personal Investment Corporation," or "PICO"), together with one or two individuals affiliated with an entity which described itself as an "investment advisor," and which purported to have special trading expertise ("Company Z"). The client was a 20% shareholder in the PICO, and the other individuals were 80% shareholders ("the Company Z shareholders" or the "majority shareholders"). The PICO client funded the S-Corporation with an amount equal to approximately 4% of the tax loss the client wanted to generate (in other words, 4% of the income the client wished to shelter from taxes).

b)   Company Z would then use those funds to engage in trading activity, entering into financial instruments commonly known as "straddles." The "straddles" were designed to generate essentially off-setting gains and losses, which could be realized for tax purposes, or "triggered," separately. By pre-arrangement, the trading would be carried out for approximately 60-90 days, and then the gains would be triggered. When that occurred, 80% of the gains would be allocated to the majority shareholders for tax purposes, and only 20% of the gains would be allocated to the client.

c)   By further pre-arrangement, the client would then buy out or "redeem" the Company Z shareholders from the PICO. At that point, the client would be the 100% shareholder. Once the client was the 100% shareholder, the losses would be triggered, and 100% of the losses (an amount roughly equivalent to the amount of income the client was seeking to shelter) would be allocated to the client for tax purposes. These losses were artificial losses, in that there were no corresponding economic losses suffered by the client.

-39-

d)    In order for the client to claim the full benefit of the losses

generated, the client would then contribute additional assets to the PICO entity. As long as the

additional assets remained in the PICO entity, the tax liability on the client's income would be

deferred. When the assets were removed from the entity, those assets would be taxed at the

capital gains rate.

57.    As the conspirators knew, in order for the PICO strategy to survive IRS

scrutiny, it required a non-tax "business purpose." With knowledge that the true motivation

behind the strategy was for the clients to obtain tax benefits, the conspirators developed a false

cover story to explain to the IRS – if the client were audited – why the client created an S-

Corporation together with the Company Z shareholders, only to "buy out" those shareholders

after 60-90 days. According to the cover story, each client formed an S-Corporation because the

client wanted to use that entity as their principal investment vehicle, and because the client

wanted to achieve asset protection and estate planning objectives. The client included the

Company Z shareholders in the S-Corporation, according to the cover story, in order to "try out"

Company Z's trading strategy, and the client intended to make a decision at the end of 60 or 90

days -- based on trading performance -- whether to continue with that strategy. According to the

story, if the client was satisfied with the trading strategy, the client would buy out the other

shareholders, and then enter into a two-year asset management agreement with Company Z, or

with one of Company Z's affiliates, so that the client could continue to enjoy the benefit of

Company Z's special trading expertise.

58.    In addition to developing the false cover story, the conspirators took other

steps to conceal from the IRS the fact that PICO was primarily, if not exclusively, tax-motivated,

-40-

and that it was designed, marketed and implemented as a pre-planned series of steps. Among other things:

a)    The E&Y defendants developed and used promotional materials that referred to PICO as "a long-term personal investment vehicle, integrating investment management services with estate planning and asset protection services."

b)    Defendant ROBERT COPLAN directed that no promotional materials be left with clients, in order to prevent those materials from falling into the hands of the IRS. In an email sent in June 2001 to PFC personnel, as well as to defendants MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, COPLAN stated, "PICO slides are not to be left with clients, and this is a policy we must all adhere to. This is ultimately for the client's protection." In a later email, also sent to PFC personnel and to his co-defendants, COPLAN remarked that "a fax of the materials to certain people in the . . . government would have calamitous results," and he urged, "Please take us seriously when we instruct that you not leave PICO materials behind at your presentations. . . . Impress upon [prospective PICO clients] that it [is] for their protection should they proceed with the strategy that we are not leaving them behind (i.e., in the event of an audit)."

c)    Defendant ROBERT COPLAN opposed a proposal by one PFC professional to provide clients with a work plan that laid out the steps of the transaction. In an email copied to defendant RICHARD SHAPIRO, COPLAN stated, "[A]fter we go to the trouble to make sure the client does not have any documents that walk through the steps of the transaction, I cannot imagine that we would want to hand him a work plan that shows each minute step including the redemption of the S shareholder. I would strongly advise against

-41-

providing a written document to the client that lays out these steps as a prearranged plan."

   d)  Defendant ROBERT COPLAN directed that a promotional brochure developed by Company Z, and biographical information concerning Company Z's officers, be provided not only to prospective PICO clients, but also to clients who had already completed PICO transactions. He explained that these documents "convey necessary information for the client to have made an informed decision to embark on a new investment program with [Company Z]."

   e)  Although E&Y's fee for the PICO transaction was calculated as approximately 2% of the loss the client wished to generate, defendant ROBERT COPLAN directed that a fee of only $50,000 be listed in the client's engagement letter.

   f)  The conspirators arranged for the balance of E&Y's fee to be paid by the client to Company Z or to one of its affiliates, and for Company Z's affiliate then to pay the remainder to E&Y. In order to justify such large payments from Company Z's affiliate to E&Y, the conspirators created a phony contract under which E&Y claimed to have performed consulting services to the affiliate. Those contracts – which were actually created and signed well after most of the clients' PICO fees had already been passed through the affiliate to E&Y – were back-dated in order to make this discrepancy less obvious. Defendant RICHARD SHAPIRO's concern that the so-called "consulting contract" for the 2000 PICO transactions had not been executed as of April 2001 was reflected in an email he sent to individuals at Company Z and Law Firm C, in which he stated, "I STILL DO NOT HAVE THE TAX CONSULTING AGREEMENT FROM LAST YEAR. WITH MOST OF THE PAYMENTS MADE UNDER THAT AGREEMENT ALREADY, DON'T YOU THINK WE (AND YOUR CLIENTS)

SHOULD HAVE A FINAL DRAFT THAT CAN BE SIGNED???????  WE MUST HAVE
SOMETHING FOR OUR FILES."

        g)      After it became apparent that PICO clients were not inclined
to continue conducting trading activities in their PICO entities after redeeming the Company Z
shareholders, the E&Y defendants encouraged them to do so in order to protect the clients'
claims that the PICO transaction was not tax-motivated.  In a March 2001 email to PFC
personnel, with copies to his three E&Y co-defendants, defendant ROBERT COPLAN
explained, "When the PICO strategy was developed, E&Y and [Company Z] understood that the
client's representations regarding his non-tax investment motives and expectation of a pre-tax
profit would depend on maintaining trading activity after the 80% shareholders were redeemed."
COPLAN observed that this was apparently "not the preferred approach of clients," and
therefore, that PFC personnel had to "establish some guidelines and properly manage client
expectations[.]"  The problem continued; a few months later, COPLAN followed up with a
similar email, reiterating the need for clients to engage in trading activity in their PICO entities,
and stating, "Because we see reports that this is not the direction certain clients are headed in, we
feel it necessary to establish some guidelines."

        59.     In order to persuade the IRS that the tax results achieved through the PICO
strategy were allowable, and to avoid the imposition of penalties on clients if the IRS were to
disallow those results, the conspirators arranged for Law Firm C and Law Firm D to provide the
clients with opinion letters.  The E&Y defendants and their co-conspirators knew these opinion
letters contained false and fraudulent statements and omitted material facts, including but not
limited to the following:

-43-

a)    The opinion letters stated that the PICO S-Corporations were not formed to avoid or evade federal income taxes, but were instead designed to facilitate investment activities, provide asset protection and achieve estate planning objectives.  In reality, as the conspirators well knew, the S-Corporations were formed precisely so that clients could avoid or evade taxes.

b)    The opinion letters stated that the Company Z shareholders became investors in the various PICOs in order to demonstrate the potential return available through interest rate arbitrage trading activity, when in reality, this step was necessary to accomplish the desired tax results.

c)    The opinion letters stated that the trading strategy was not designed to produce a predetermined result, when in reality, E&Y had marketed to its clients, and the clients had paid fees to E&Y and Company Z to obtain, a strategy consisting of a pre-planned series of steps leading to a predetermined tax benefit.

d)    The opinions issued by Law Firm C failed to disclose that they were rendered by an attorney who had assisted the E&Y defendants and the principals of Company Z in designing, marketing, and implementing the transaction, and therefore were not independent.

### The IRS's 2002 Voluntary Disclosure Initiative

60.    In or about December 2001, the IRS announced a program under which taxpayers who had engaged in tax shelters could voluntarily disclose those transactions to the IRS, in exchange for amnesty from penalties that might otherwise be imposed if the IRS were to

audit the transactions and find a tax underpayment.  In order to qualify for the program,

taxpayers were required to disclose the transaction to the IRS, and to include in their disclosures,

among other things, a statement describing the "material facts" of the transaction; the names and

addresses of parties who had promoted, solicited or recommended the transaction to the taxpayer,

and parties who had collected fees from the transaction;  a statement agreeing to provide various

documents and materials relating to the transaction, including marketing materials and legal

opinions; and a statement signed by the taxpayers, under penalties of perjury, that the taxpayers

had examined their disclosures, and that to the best of their knowledge and belief, the disclosures

contained all the relevant facts and were true, correct and complete.

      61.    During 2002, defendants ROBERT COPLAN, MARTIN NISSENBAUM

and RICHARD SHAPIRO prepared, and assisted in preparing, templates that could be used by

E&Y clients who had engaged in tax shelters, and who wished to participate in the IRS's

voluntary disclosure initiative in order to eliminate the possibility of IRS penalties.  Although

COPLAN, NISSENBAUM and SHAPIRO knew that participation in the program required the

submission of a "true, correct and complete" disclosure to the IRS of "all relevant facts" in a

statement that would subject their clients to penalties of perjury, they drafted template disclosure

letters that contained many of the same false and fraudulent statements that had previously been

included in transaction documents and opinion letters, and omitted many of the same material

facts.  Tax shelter clients who participated in the voluntary disclosure initiative thereafter

submitted false, fraudulent and incomplete statements to the IRS.

### The E&Y Promoter Penalty Audit

62.      In or about April 2002, the IRS began an examination of whether E&Y

had complied with various legal requirements applicable to the firm's tax shelter activities.  In

connection with that examination – commonly referred to as a "promoter penalty audit" – the

IRS sought documents and sworn testimony from individuals knowledgeable about the

VIPER/SISG tax shelters.  In June and August of 2002, defendants ROBERT COPLAN,

MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN appeared before the

IRS to answer questions.  After being placed under oath, they sought to obstruct and impede the

IRS by providing false and misleading testimony concerning the origin, design, marketing and

implementation of E&Y's tax shelters.

a)      Among other things, COPLAN provided the following false

and misleading testimony: that E&Y had no involvement in the operation of the CDS trading

partnerships; that the CDS clients were not sure whether the CDS swaps would terminate early,

and thus did not know whether the income they received in the second year of the swap would be

characterized as capital gains; that the fees charged to CDS clients were "fixed fees" rather than

fees calculated based on a percentage of the tax benefits; that when E&Y became involved with

CDS Add-On, the CDS partnerships were already planning to consolidate digital options in a

single LLC, and that E&Y learned about the plan as a "fortuitous circumstance";  that no

promotional materials had been distributed or shown to CDS Add-On clients because COPLAN

and others "didn't think the transaction was that complicated"; that the fees paid by the PICO

investment advisor to E&Y were paid "for consulting with them on the tax aspects of the PICO

transaction"; and that the reason an S-Corporation was used for PICO instead of a partnership

was that clients viewed the S-Corporation as a "good family investment vehicle."

        b)     Among other things, VAUGHN provided the following false and misleading testimony: that the VIPER/SISG group was not involved in the wide-spread marketing of tax shelters, but instead merely responded to questions and proposals that came from clients; that the CDS Add-On transaction was brought to E&Y's attention by defendant CHARLES BOLTON, who had already created a fund, and had offered E&Y's clients an opportunity to participate in that fund; that the digital options used in the Add-On transaction were purchased "from the investment standpoint," and were "just part of [the client's] investing"; that the fees charged by E&Y for the digital option transactions were "fixed fees" calculated based on E&Y's assessment of how much time would be spent by particular E&Y personnel involved with a particular transaction for a specific client; that E&Y did not set fees based upon a percentage of tax results; that E&Y "typically" encouraged its clients to use their own counsel, and recommended counsel if the clients felt their own counsel were "not competent in digital option taxation"; that the VIPER/SISG group maintained no database of documents relating to its tax shelters; that E&Y did not develop its own brand of digital option trade, and that there was "no tax strategy, per se, that was developed internally by E&Y's individual tax practice"; that there were no predetermined tax benefits for the Add-On strategy, and that "it was very difficult" to estimate the Add-On tax benefits until after the transactions were complete; and that he could not recall the nature of COPLAN's involvement in the Add-On strategy, or that SHAPIRO provided the subject matter expertise for the digital option transactions.

        c)     Among other things, NISSENBAUM provided the following misleading testimony: that the CDS partnership was a "trading partnership"; and that the

partnership "would be trading in short-term securities to get as much short-term profit as possible."

        d)     Among other things, SHAPIRO provided the following false and misleading testimony: that E&Y "received fees for tax consulting services" provided to Company Z in connection with the development of PICO; and that COBRA was designed to provide an investor with the ability to obtain a return of approximately 31% with "a probability of success of just under 40%."

### The BCP Promoter Penalty Audit

63.     In or about May 2004, the IRS began an examination of whether BCP had complied with various legal requirements applicable to the firm's tax shelter activities. In connection with that promoter penalty audit, the IRS sought documents and information from BCP. In responding to those requests for information and documents, representatives of BCP produced to the IRS various false and fraudulent documents, including opinion letters issued by Law Firm A for the CDS and Add-On, representations letters relating to the opinions issued for CDS and Add-On, and loan agreements, notes and guarantees relating to Add-On.

### IRS Examinations of the Various Tax Shelters

64.     As a result of information provided in connection with the voluntary disclosure initiative, as well as information produced by E&Y and the Bolton companies during the promoter penalty audits, and in taxpayer audits, the IRS undertook detailed examinations of many of the CDS, COBRA, CDS Add-On, and PICO shelters. In connection with these examinations, the IRS sent Information Document Requests ("IDRs") to many of

-48-

E&Y's individual tax shelter clients, and to many of the entities created by the conspirators in order to execute the tax shelters. Those IDRs sought additional information, and requested production of various documents. Defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO, together with others at E&Y, participated in the production of information and documents to the IRS in response to those IDRs. Defendant CHARLES BOLTON, together with others at the Bolton companies, also participated in the production of information and documents to the IRS in response to those IDRs. In that process, many of the false and fraudulent explanations and cover stories that had been created by the conspirators to conceal the tax motivations behind the shelters were presented to the IRS, and many of the false and fraudulent documents that had been created by the conspirators to conceal those tax motivations – including opinion letters and correspondence – were produced to the IRS. The IRS also took sworn testimony from various individuals involved in the marketing and implementation of the shelters, including clients, financial advisors to clients, E&Y personnel, and defendants DAVID L. SMITH and CHARLES BOLTON.

65.    Represented by attorneys and professionals provided by E&Y, various tax shelter clients and their financial advisors gave false and misleading testimony and statements to the IRS concerning, among other things, the clients' motivations for entering into the tax shelter transactions in question.

66.    On or about December 9, 2003, defendant DAVID L. SMITH gave sworn testimony to the IRS concerning one of the CDS transactions implemented in 1999 by PCMG. Among other things, SMITH falsely testified that he not explained the tax ramifications of CDS to the bank that implemented the transaction, and that he had not received any money from

-49-

defendant CHARLES BOLTON in connection with CDS. In reality, SMITH had explained the

tax ramifications to the bank, and BOLTON had paid SMITH $3.75 million to license CDS.

67.    On or about April 12 and 13, 2005, defendant CHARLES BOLTON

gave sworn testimony to the IRS concerning two CDS transactions implemented by BCP in

2000. Among other things, BOLTON falsely testified that E&Y never indicated that the CDS

swaps would terminate early; that the decision to terminate the swaps was based on "economics";

that there was no understanding or agreement – either written or non-written – that the swaps

would terminate early; and that he did not recall what tax benefits CDS clients could receive

based on their loans.

### The E&Y Partners' Own Fraudulent Tax Shelter (The "Tradehill" Transaction)

68.    In addition to designing, marketing and implementing fraudulent tax

shelters for clients and prospective clients of E&Y, defendants ROBERT COPLAN, MARTIN

NISSENBAUM and RICHARD SHAPIRO developed and utilized a tax shelter to evade their

own taxes, and assisted eight other E&Y partners to do the same. The strategy they employed

was a short option strategy, similar to a COBRA shelter.

69.    In or about late 1999 or early 2000, E&Y announced a proposal to sell its

global consulting business to a French company called Cap Gemini. In that transaction, E&Y

partners would receive shares of stock in the new company. Those shares would be denominated

in euros, and would not be transferable for a period of time that was unknown, but that was

expected to exceed four years. Although the stock received by the partners could not be sold, the

E&Y partners were told that their receipt of the stock would constitute income on which they

would be taxed in 2000. Accordingly, in order to assist the partners in paying their tax liabilities on the stock received, E&Y proposed to sell some of the Cap Gemini stock at the time of the transaction, and to give each partner – in addition to shares of Cap Gemini stock – cash that could be used by that partner to cover his or her 2000 personal income tax liability generated by receipt of the stock.

70.    After a vote of E&Y's partners, the transaction took place in or about May 2000, and on or about May 23, 2000, defendants ROBERT COPLAN, MARTIN NISSENBAUM, and RICHARD SHAPIRO, as well as other E&Y partners, each received a distribution of Cap Gemini stock. An amount of cash was set aside by E&Y for their use in paying income taxes on the stock they received.

71.    Upon learning of the intended Cap Gemini transaction, defendant MARTIN NISSENBAUM began discussing with other E&Y partners the possibility of using a tax shelter to eliminate the income tax liability arising from their receipt of the Cap Gemini stock. By late October 2000, a group of eleven E&Y partners, including defendants ROBERT COPLAN, MARTIN NISSENBAUM, and RICHARD SHAPIRO, had decided to form an entity called Tradehill Investments, LLC ("Tradehill"), and to use Tradehill to carry out a transaction similar to COBRA, thereby eliminating all or most of their tax liability on the Cap Gemini stock ("the Tradehill transaction"). The three defendants undertook to act as representatives for the other E&Y partners.

72.    In order to execute the transaction, defendant MARTIN NISSENBAUM, working in conjunction with a tax shelter promoter and with attorneys from Law Firm D, created Tradehill, in which all eleven E&Y partners were members. The Operating Agreement for

-51-

Tradehill falsely stated that Tradehill was organized "for investment purposes." The defendants created a second entity called Churchwind Investments, LLC ("Churchwind"), which was wholly owned by Tradehill. The Operating Agreement for Churchwind – which was signed by NISSENBAUM, as well as by defendants ROBERT COPLAN and RICHARD SHAPIRO – falsely stated that Churchwind was organized "for investment purposes."

73.    The eleven members of Tradehill collectively contributed $350,000 in cash, and on or about November 1, 2000, defendant MARTIN NISSENBAUM caused Churchwind to acquire three almost completely offsetting pairs of euro/dollar currency options. The premiums paid for the three long options totaled $25 million, but the actual cost to the partners (the "net premium") was only $350,000. The three option pairs all had different maturity dates, one in April 2001, one in May 2001, and one in June 2001.

74.    On or about November 13, 2000, defendant MARTIN NISSENBAUM, acting on behalf of the group, caused Tradehill to contribute the three pairs of currency options to an entity called AD International FX Fund, LLC ("ADFX"), in exchange for 90% ownership of ADFX. The other two owners of ADFX were tax shelter promoters who had contributed a total of $30,000 in cash to the entity.

75.    In or about mid-December 2000, ADFX closed out one of the euro/dollar option pairs that had been contributed by Tradehill, and purchased shares of stock. Then, on or about December 19, 2000, defendant MARTIN NISSENBAUM caused Tradehill to resign from ADFX in exchange for stock, dollars and euros worth approximately $187,246. At that time, none of the three option pairs contributed to ADFX by Tradehill was "in the money," and the maturity dates of the three options were approximately four, five and six months away.

-52-

76.     On or about December 26, 2000, defendant MARTIN NISSENBAUM

caused Tradehill to distribute the stock it had received upon resignation from ADFX to two new

entities, Hiddenbrook Holding, LLC ("Hiddenbrook"), and Greenoak Holdings, LLC

("Greenoak").  Hiddenbrook – which had been created only days earlier – had five members,

including defendants MARTIN NISSENBAUM, ROBERT COPLAN and RICHARD

SHAPIRO.  The members of Greenoak – which had also been created only days before – were

the other six E&Y partners.  The same day, NISSENBAUM directed the immediate sale of the

stock distributed to Hiddenbrook, and a member of Greenoak directed that Greenoak's shares be

sold.  The shares were sold the following day, triggering artificial losses.

77.     From in or about December 2000 through in or about mid-April 2001, an

attorney at Law Firm D, working together with defendant MARTIN NISSENBAUM, drafted a

legal opinion.  The opinion was intended to be used to support the position that the losses

triggered by the sale of stock by Hiddenbrook and Greenoak could be used by the eleven E&Y

partners to eliminate the tax liability related to their Cap Gemini stock, and to protect the eleven

partners against IRS penalties.

78.     In connection with the drafting of that opinion, defendant MARTIN

NISSENBAUM assisted in preparing a "Certificate of Facts."  The "Certificate of Facts" – which

contained false and fraudulent statements – was intended to be incorporated by reference into

Law Firm D's opinion, and was intended to deceive the IRS into believing that the E&Y partners

executed the various steps of the Tradehill transaction for investment reasons rather than tax

reasons.  Among other things, the document falsely stated: 1) that "[t]he purpose and purchase

and sale of [the] Options [was] that Tradehill believed that such investments could result in

-53-

substantial profits with only limited downside risk"; 2) that Tradehill contributed its membership interest in Churchwind to ADFX to "diversify its risk"; 3) that Tradehill's "primary motivation" in participating in the transaction "was to attain, on a risk-adjusted basis, an attractive return on its investment . . . without regard to tax benefits"; and 4) that "the decision to withdraw from [ADFX] was based on a variety of factors, including anticipated future market conditions, currency exchange rates, interest rates, the availability of alternative investments, and Tradehill's financial situation."

79.    In or about April 2001, Law Firm D – which had assisted the defendants in creating the entities used to execute the shelter – issued a back-dated opinion letter to Hiddenbrook and Greenoak. The opinion letter incorporated the false statements contained in the "Certificate of Facts" described in paragraph 78, above. In addition, the opinion letter falsely stated, among other things, that all "pertinent facts" relating to the transaction had been set forth in the opinion.

80.    From in or about April 2001 through in or about October 2001, defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO, as well as their eight partners, filed tax returns on which they used the losses generated through the Tradehill transaction to eliminate tax liability on all or most of the income they received in the form of stock and cash from the Cap Gemini transaction.

81.    In or about May 2003, the IRS notified the eleven participants in the Tradehill transaction that their 2000 tax returns were being audited. In connection with that audit, the IRS sent each of the eleven partners who had participated in the Tradehill transaction an Information Document Request ("IDR #1"), requesting both information and documents. The

members of the group made arrangements for an attorney at Law Firm D to represent them in responding. Defendant MARTIN NISSENBAUM assisted that attorney in drafting responses on behalf of each partner to IDR #1, as well as to a second IDR ("IDR #2") and a third IDR ("IDR #3"). Copies of the partners' letters to the IRS were sent to defendant MARTIN NISSENBAUM.

82.    The responses to IDR #2 were sent to the IRS on or about September 25, 2003. Those responses contained false and misleading statements, including but not limited to the following: 1) statements that the E&Y partners had entered into the Tradehill transaction in order to generate profits, when in reality the transaction had no reasonable possibility of generating a profit; 2) a statement that the Tradehill transaction was intended fully to hedge the partners' exposure to fluctuation in the euro, when in reality, the transaction had no capacity to do so; 3) a statement that there were no unwritten understandings between the participants in the Tradehill transaction, when in reality, there was an understanding among all the parties to the transaction that the E&Y partners would exit their option positions before the end of 2000, in order to claim tax losses they could use to offset their Cap Gemini income; and 4) a statement that there was no expectation or referral of any future business to Law Firm D, when in reality, in 2001, the defendants referred PICO clients to Law Firm D for opinion letters.

### Charles Bolton's Own Fraudulent Tax Shelters

83.    In 2000 and 2001, in addition to implementing fraudulent tax shelters for clients of E&Y, defendant CHARLES BOLTON utilized CDS tax shelters to reduce and defer his own tax liability on income he earned from implementing CDS and CDS Add-On for numerous clients. In order to carry out the first CDS transaction, BOLTON caused the creation

of BIG Trading Partners, L.P. ("BIG Trading Partners") in October 2000. BCP was the general

partner of BIG Trading Partners, and BOLTON was the limited partner.

84.     In or about October 2000, defendant CHARLES BOLTON caused BIG

Trading Partners to enter into two swaps with a financial institution. As structured, those swaps

were designed to generate a business deduction for BOLTON of approximately $15 million in

2000. As part of the 2000 CDS transaction, BOLTON executed loan agreements with the same

financial institution, and signed one or more documents by which he agreed to be personally

liable for repayment of those loans, which totaled more than $9 million. BOLTON's 2000 CDS

transaction generated for him a tax deduction of approximately $14.9 million. He used that

deduction to offset his 2000 income.

85.     In late 2001, defendant CHARLES BOLTON again caused BIG Trading

Partners to enter two swaps with a financial institution. As structured, those swaps were

designed to generate a business deduction for BOLTON of approximately $25 million in 2001.

As part of the 2001 CDS transaction, BOLTON executed another loan agreement with the same

financial institution, and signed one or more documents by which he agreed to be personally

liable for repayment of that loan, which was in the amount of approximately $21 million. During

a period of approximately seventeen days in 2001, BOLTON's second CDS transaction

generated for him a tax deduction of approximately $24.9 million. He used that deduction to

offset his 2001 income.

86.     In connection with his own two CDS transactions, defendant CHARLES

BOLTON signed representation letters, prepared by Law Firm A, in which he falsely stated,

among other things, that he regarded the various investments of the Partnership – including the

swaps and the trading activities – as comprising one coherent business philosophy," and that this

diversity of investments was "an important element in [his] decision to invest in the Partnership."

87.     In support of each of his two tax shelters, defendant CHARLES BOLTON

obtained a legal opinion from Law Firm A.  Each opinion falsely stated, among other things, that

"a significant purpose of [BOLTON's] investment in the Partnership [was] to obtain a profit

through access to the specialized investment strategies and activities offered by the Partnership.

According to one of the two letters, such investments and activities were not otherwise readily

available to BOLTON.

88.     Defendant CHARLES BOLTON was audited by the IRS.  In connection

with that audit, he submitted the two legal opinions.

89.     On or about April 13, 2005, in connection with his own CDS transactions,

defendant CHARLES BOLTON gave sworn testimony to the IRS.  On that occasion, BOLTON

falsely testified, among other things, that the decision to terminate his 2000 swap at the early

termination date was made for economic reasons, and that he was not aware his own swap had to

terminate early in order for him to derive the tax benefits.

90.     On or about July 28, 2006, the IRS notified BOLTON that it intended to

assert penalties against BOLTON for claiming losses from CDS on his 2000 and 2001 tax

returns.  In its notification letter, the IRS informed BOLTON of its view that "a significant

purpose" of BOLTON's CDS transactions was tax avoidance.  In response, BOLTON submitted

a statement, signed under penalties of perjury, in which he stated that the IRS was incorrect in

asserting that a "significant purpose" of his CDS transactions was tax avoidance, and that his

decision was "primarily profit driven."

-57-

**Statutory Allegations**

91.     From in or about early 1998 through in or about 2006, in the Southern District of New York and elsewhere, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH and CHARLES BOLTON, the defendants,  together and with each other and with others known and unknown, unlawfully, willfully and knowingly did combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the United States Department of Treasury, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Section 7201, and Title 18, United States Code, Section 1001.

92.     It was a part and an object of the conspiracy that ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH and CHARLES BOLTON, the defendants, and their co-conspirators, unlawfully, wilfully and knowingly would and did defraud the United States and the IRS by impeding, impairing, defeating and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

93.     It was a part and an object of the conspiracy that ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH and CHARLES BOLTON, the defendants, and their co-conspirators, unlawfully, wilfully and knowingly would and did attempt to evade and defeat a substantial part of the income taxes due and owing to the United States by E&Y's Add-On clients, in violation of Title 26, United States Code, Section 7201.

94.    It was a part and an object of the conspiracy that ROBERT COPLAN, MARTIN NISSENBAUM, and RICHARD SHAPIRO, the defendants, and their co-conspirators, unlawfully, wilfully and knowingly would and did attempt to evade and defeat a substantial part of the income taxes due and owing to the United States by themselves and other E&Y partners, in violation of Title 26, United States Code, Section 7201.

95.    It was a part and an object of the conspiracy that ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH and CHARLES BOLTON, the defendants, and their co-conspirators, unlawfully, wilfully and knowingly would and did make materially false, fictitious, and fraudulent statements and representations in matters within the jurisdiction of the executive branch of the Government of the United States, in violation of Title 18, United States Code, Section 1001.

### Means and Methods of the Conspiracy

96.    Among the means and methods by which ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH and CHARLES BOLTON, the defendants, and their co-conspirators, would and did carry out the objectives of the conspiracy were the following:

a)    They would and did design, market and implement tax shelter transactions, and create false and fraudulent factual scenarios to support those transactions, so that wealthy individuals could pay a percentage of their income or gain in fees to E&Y, PCMG, the Bolton companies, and the other participants in the transactions, rather than paying a substantially greater amount in taxes to the IRS;

-59-

b)      They would and did design, market and implement tax shelter transactions in ways that made them difficult for the IRS to detect;

c)      They would and did design, market and implement tax shelter transactions in ways that disguised the fact that the shelters were largely or exclusively tax-motivated, and lacked substantial non-tax business purposes;

d)      They would and did seek to prevent the IRS from learning that they had marketed strategies consisting of pre-planned steps leading to pre-determined tax benefits;

e)      They would and did prepare and assist in preparing false and fraudulent documents to deceive the IRS, including but not limited to, engagement letters, transactional documents, representation letters, and correspondence;

f)      They would and did assist in crafting legal opinions designed to shield E&Y's clients from penalties, knowing that these opinions contained false, fraudulent and misleading information and omitted other information, all of which was material to a determination of whether the tax results claimed by the clients were allowable;

g)      They would and did prepare and cause to be prepared tax returns that were false and fraudulent because, among other things, they incorporated phony tax losses and thereby substantially understated the tax due and owing by the shelter clients;

h)      They would and did destroy documents and take other steps to prevent the creation and retention of materials that would reveal to the IRS the true facts surrounding the fraudulent tax shelters;

i)      they would and did provide false, fraudulent and misleading information in response to IDRs issued by the IRS in connection with audits of tax shelter

-60-

transactions;

j)      they would and did draft documents to be submitted by the tax shelter clients to the IRS in connection with the IRS's voluntary disclosure initiative, under penalties of perjury, which they knew contained false statements of material fact and omitted material facts; and

k)      they would and did make false and misleading statements, under oath, in connection with efforts by the IRS to ascertain the circumstances surrounding the design, marketing and implementation of the tax shelters.

## OVERT ACTS

97.    In furtherance of the conspiracy and to effect the illegal objects thereof, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH and CHARLES BOLTON, the defendants, and their co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a)      In or about late 1998 or early 1999, defendant DAVID L. SMITH explained CDS to the E&Y defendants.

b)      In or about early 1999, defendants ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN and DAVID L. SMITH discussed conducting "box trades" in the CDS trading accounts.

c)      In or about early 1999, defendants BRIAN VAUGHN and DAVID SMITH described CDS to potential clients.

-61-

d)      In or about mid-1999, defendant DAVID L. SMITH discussed CDS with defendant CHARLES BOLTON;

e)      In or about November 1999, the E&Y defendants created and distributed a "COBRA Action Plan" to PFC personnel, which instructed, "**DO NOT** leave marketing materials with client under any circumstances," and which further instructed, "DO NOT reference tax losses in the engagement letter."

f)      On or about December 5, 1999, defendant ROBERT COPLAN sent an email to PFC personnel whose COBRA clients had option positions that were "in the money," warning that if the clients cashed out of those positions at too large a discount, they would undermine their tax argument, which was based upon the chance of making a profit in excess of fees.

g)      In or about early February 2000, defendant CHARLES BOLTON agreed that Bolton Asset Management, LLC ("BAM") would license CDS from defendant DAVID L. SMITH, and would pay SMITH royalties based on the net fees generated.

h)      On or about February 8, 2000, defendant RICHARD SHAPIRO sent an email to defendants ROBERT COPLAN, MARTIN NISSENBAUM and BRIAN VAUGHN, offering to be involved in CDS sales contacts.

i)      On or about February 8, 2000, after reviewing a proposed "CDS Action Plan," defendant RICHARD SHAPIRO sent an email to defendants ROBERT COPLAN, MARTIN NISSENBAUM, and BRIAN VAUGHN, among others, expressing his concern about the existence of a document which laid out in writing "all the chapters and verses" of CDS, and which indicated "before the fact" that the swaps would terminate early.

-62-

j)    In or about early 2000, the defendants created and distributed a "CDS Action Plan" to PFC personnel which instructed, "**DO NOT** leave marketing materials with client under any circumstances," and which further instructed, "**DO NOT** reference tax losses in the engagement letter."

k)    On or about February 18, 2000, Belle Six, a co-conspirator not named as a defendant herein, sent an email concerning an economic model prepared for a CDS transaction, stating, "[I]n meeting with the E&Y people on Tuesday, we have a list of things that we would like you to change on the model. . . . We don't want to highlight that we don't anticipate trading profits.  Please remove it from the economic model."

l)    On or about April 14, 2000, defendant RICHARD SHAPIRO told defendants ROBERT COPLAN, MARTIN SHAPIRO, and BRIAN VAUGHN in an email that it was "essential" to delete from a CDS economic model a footnote stating that the calculations set forth in the model assumed early termination of the swap.

m)    On or about April 21, 2000, in response to concerns expressed by a PFC practice member that CDS could result in a complete loss of the CDS partnership's capital, thereby exposing the client to personal liability, Belle Six, a co-conspirator not named as a defendant herein explained, "In reality, even if the client loses everything they will not have to contribute any more money."

n)    In or about early May 2000, in an Instant Message ("IM") conversation between defendant BRIAN VAUGHN and defendant ROBERT COPLAN, VAUGHN told COPLAN about an idea to combine the CDS strategy with the COBRA strategy.

-63-

o)    On or about May 5, 2000, defendant ROBERT COPLAN forwarded his IM conversation with defendant BRIAN VAUGHN to defendants MARTIN NISSENBAUM and RICHARD SHAPIRO.

p)    On or about June 5, 2000, defendant ROBERT COPLAN sent an email to PFC practice members, announcing the availability of the CDS Add-On strategy, in which he described it as an "indefinite capital gain deferral strategy."

q)    On or about June 14, 2000, defendant ROBERT COPLAN sent an email to PFC professionals, explaining that if PowerPoint slides setting out the steps of CDS Add-On "ever made their way to the IRS . . . the entire business purpose argument that [gave] us the ability to distinguish this from COBRA would be out the window."

r)    On or about July 10, 2000, defendant ROBERT COPLAN drafted a letter to be sent by E&Y to prospective CDS Add-On clients, in which he described the Add-On strategy as a consolidation of a portion of the client's trading account "to further diversify the trading and enhance performance."

s)    On or about July 20, 2000, a co-conspirator not named as a defendant herein who was employed by the Bolton companies sent an email to defendant CHARLES BOLTON and others, explaining that due to the limited volume of trading being done by traders for the CDS portfolios, it was necessary to consider allocating a portion of the portfolios to a trader who had lost money previously.

t)    In or about June or July 2000, defendant DAVID L. SMITH signed letters to E&Y's 1999 CDS clients, advising them that "in an effort to diversify trading returns and enhance performance," PCMG was considering the possibility of trading in digital currency

-64-

options, and stating that once such trading had begun, PCMG would "consider whether the [client's CDS partnership] should consolidate its trading account into a single entity with the trading accounts of others . . ., in order to further enhance returns by utilizing economies of scale, reducing administrative costs, and simplifying the trading structure."

u)    In or about mid- to late July 2000, defendants DAVID L. SMITH and CHARLES BOLTON signed three agreements under which BCP took over PCMG's role as the general partner for the 1999 CDS partnerships that were planning to participate in the Add-On shelter.

v)    On or about August 4, 2000, defendant ROBERT COPLAN sent an email to defendants MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, as well as to PFC practice members, in which he explained that a loan amendment document would highlight for the IRS the issue of whether the CDS clients had personal liability on their CDS loans, and advised them "to dispose of the loan amendment document after you have reviewed it."

w)    On or about August 9, 2000, pursuant to an agreement to pay defendant BRIAN VAUGHN for his role in providing tax shelter clients, defendant CHARLES BOLTON directed that $1 million be transferred to another account, purportedly for the purchase of a copyright on a song composed by VAUGHN.

x)    From in or about August 2000 through November 2000, defendant CHARLES BOLTON directed the payment of approximately $3.75 million to defendant DAVID L. SMITH, pursuant to the CDS licensing agreement.

y)     In or about September 2000, defendant DAVID L. SMITH signed a letter notifying the bank that served as the counter-party to the 1999 CDS transactions that several CDS partnerships wished to terminate their swaps at the early termination date.

z)     On or about September 20, 2000, in an effort to increase the total value of trades in the CDS trading accounts, approved hiring a trading firm without a significant track record that was willing to create trades for the Bolton companies that involved low risk and low returns.

aa)     On or about October 25, 2000, defendant CHARLES BOLTON formed BIG Trading Partners, L.P.

bb)     On or about October 28, 2000, defendant CHARLES BOLTON caused BIG Trading Partners to enter into two swaps and two loan agreements with a financial institution.

cc)     On or about November 27, 2000, defendant ROBERT COPLAN sent an email to another PFC professional, with a copy to defendants RICHARD SHAPIRO and BRIAN VAUGHN, explaining that SISG did not leave with clients promotional materials that went through the steps of a strategy, or that highlighted the benefits of a strategy, because "the less evidence there is that the client responded to a tax-savings promotion, the better his argument that there were non-tax motivations guiding his actions."

dd)     On or about November 20, 2000, defendant ROBERT COPLAN sent an email to E&Y personnel whose clients had implemented Add-On transactions, explaining the purpose of the "second round of digital options" letter.

-66-

ee)     In or about 2000 and 2001, defendant MARTIN NISSENBAUM participated in presenting the CDS strategy to clients.

ff)     In or about 2000 and 2001, defendant MARTIN NISSENBAUM participated in presenting the PICO strategy to clients.

gg)     In or about late 2000, defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO signed the Tradehill Operating Agreement and the Churchwind Operating Agreement.

hh)     In or about November 2000, defendant MARTIN NISSENBAUM caused the contribution of Churchwind to ADFX.

ii)     On or about January 22, 2001, in connection with the registration of CDS as a tax shelter, defendant CHARLES BOLTON submitted to the IRS a document entitled "Description of the Transaction Registered by Bolton," which stated, "If the general partner, based on market fluctuations, terminates the swap contracts early, capital gain would arise on such termination."

jj)     On or about February 7, 2001, defendant ROBERT COPLAN sent an email to the defendants and to other PFC personnel, explaining that assets placed in the PICO LLC's trading account should be used for trading, and that this needed to be addressed with clients who had "different ideas."

kk)     On or about April 15, 2001, defendant ROBERT COPLAN filed his Form 1040 for the year 2000, on which he reported losses he had generated through the Tradehill transaction.

-67-

ll)    On or about April 16, 2001, defendant MARTIN NISSENBAUM filed his Form 1040 for the year 2000, on which he reported losses he had generated through the Tradehill transaction.

mm)    On or about May 17, 2001, defendant RICHARD SHAPIRO discussed COBRA with representatives of the IRS in connection with the audit of three COBRA clients.

nn)    On or after May 9, 2001, defendant ROBERT COPLAN signed a consulting agreement between E&Y and an affiliate of Company Z, which was backdated to January 3, 2001.

oo)    On or about May 22, 2001, defendant RICHARD SHAPIRO sent an email cautioning against leaving presentation materials with clients, explaining that in the Minneapolis COBRA audit, the taxpayer had been asked to produce promotional materials.

pp)    On or about May 24, 2001, defendant ROBERT COPLAN sent an email to defendants MARTIN NISSENBAUM and RICHARD SHAPIRO, as well as others, recommending that the CDS partnerships maintain their trading activity through the end of the year in which the CDS swaps terminated, in order to avoid raising an issue with the IRS about whether the CDS partnerships were actually engaged in a trade or business.

qq)    On or about June 6, 2001, defendant ROBERT COPLAN asked Belle Six, a co-conspirator not named as a defendant herein, to consider changing the names of the CDS partnerships so that it would be more difficult for the IRS to identify all the CDS transactions.

rr)     On or about June 28, 2001, defendant BRIAN VAUGHN sent an email to a co-conspirator, stating with respect to a CDS transaction, "We should consider removing the footnote language concerning implied early termination. This could adversely affect our tax situation given the level of audits that are currently in progress. . . . Remember our goal is to convince the agents the client did not have a predisposition of early termination."

ss)     On or about July 12, 2001, defendant ROBERT COPLAN sent an email directing that clients who had already implemented  PICO transactions be given a brochure describing PICO, and explaining that the brochure conveyed information necessary "for the client to have made [an] informed decision" to embark on the PICO transaction.

tt)     On or about July 17, 2001, defendant ROBERT COPLAN sent an email directing the recipients immediately to "delete and dispose of" COBRA materials in their files and their computers.

uu)     On or about August 16, 2001, defendant RICHARD SHAPIRO filed his Form 1040 for the year 2000, on which he reported losses he had generated through the Tradehill transaction.

vv)     On or about September 14, 2001, defendant ROBERT COPLAN emailed a form letter to E&Y personnel whose CDS clients might wish to close down their trading accounts, suggesting that the clients use the form letter – which attributed their desire to end their trading activity to the September 11th terrorist attacks – to "document for the file a logical non-tax rationale."

ww)     On or about October 15, 2001, defendant CHARLES BOLTON filed his Form 1040, for calendar year 2000, on which he claimed a loss of $14,919,583 from

participating in a CDS transaction through BIG Trading Partners.

xx)    On or about October 31, 2001, in response to an email from defendant ROBERT COPLAN inquiring about how to respond to an IDR sent by the IRS in connection with a COBRA audit, defendant MARTIN NISSENBAUM stated, "Never give them more than they ask for. (That's why we never allow clients to attend examinations, they talk too much)."

yy)    On or about November 12, 2001, defendant ROBERT COPLAN emailed defendants MARTIN NISSENBAUM and RICHARD SHAPIRO, informing them, "Bolton is suggesting that the [CDS] partnerships be shut down after essentially 13.5 months," and asking, "Should we intercede and suggest running another year out with the trading account?"

zz)    On or about November 12, 2001, defendant MARTIN NISSENBAUM responded to the email sent by defendant ROBERT COPLAN earlier that day, stating, "Yes. They sound way too anxious to get out."

aaa)    On or about November 12, 2001, defendant RICHARD SHAPIRO responded to the two emails sent by defendants ROBERT COPLAN and MARTIN NISSENBAUM earlier that day, stating, "I AGREE WITH MARTIN."

bbb)    On or about November 26, 2001, defendant ROBERT COPLAN sent an email to an E&Y employee, discouraging the use of a document that described SISG's strategies and their accompanying tax benefits, explaining that such documents would provide evidence of their clients' tax avoidance motives, and that SISG's "ultimate goal" was "to make our strategies appear to be investment techniques that have advantageous tax consequences."

ccc)    On or about December 14, 2001, defendant CHARLES BOLTON caused BIG Trading Partners to enter into two swaps and two loan agreements with a financial institution.

ddd)    In or about February and March 2002, defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO drafted and reviewed template disclosure documents that would be used by clients who wished to participate in an amnesty program announced by the IRS.

eee)    On or about June 12, 2002, defendant BRIAN VAUGHN gave false and misleading testimony to the IRS.

fff)    On or about June 20, 2002, defendant ROBERT COPLAN gave false and misleading testimony to the IRS.

ggg)    On or about October 15, 2002, defendant CHARLES BOLTON filed his Form 1040 for calendar year 2001, on which he claimed a loss of $24,994,225 from participating in a CDS transaction through BIG Trading Partners.

hhh)    In or about September 2003, defendant MARTIN NISSENBAUM provided false and misleading information to an individual who was preparing responses to IDRs sent by the IRS to the eleven E&Y partners who had participated in the Tradehill transaction.

iii)    On or about December 9, 2003, defendant DAVID L. SMITH provided false and misleading testimony to the IRS.

jjj)    On or about April 12 and 13, 2005, defendant CHARLES BOLTON provided false and misleading testimony to the IRS.