# Exhibit A-3

kkk)    On or about August 18, 2006, defendant CHARLES BOLTON

signed a document under penalties of perjury, stating that his participation in his CDS

transactions was "primarily profit driven," and that tax avoidance was not a "significant

purpose."

(Title 18, United States Code, Section 371).

## COUNT TWO

### (Tax Evasion of The L. Trading Group)

The Grand Jury further charges:

98.    The allegations set forth in paragraphs 1 through 10, 12 through 18, 27

through 53, 60 through 67, 96 and 97 are repeated and realleged as if fully set forth herein.

99.    Among the entities that participated in the Add-On tax shelter

without first having done a CDS shelter was a trading group referred to herein as the "L. Trading

Group." The L. Trading Group was a company whose two members were involved in options

trading. In July 2000, E&Y personnel met with representatives of the L. Trading Group and

offered the L. Trading Group the opportunity to defer indefinitely the tax liability of the

company's members on income earned in 2000. The two L. Trading Group members decided to

use the Add-On strategy to generate a tax loss of $30 million. Because the L. Trading Group was

a "pass-through" entity for tax purposes, that tax loss could be used by the members to offset

their individual income for 2000.

100.    On or about August 3, 2000, the Bolton companies arranged for the L.

Trading Group to acquire three pairs of digital currency options. The premiums on the three long

-72-

options totaled approximately $30 million. The cost to the L. Trading Group of the three option

pairs (the "net premium") was approximately $150,000, and the maturity date was November 3,

2000. The option pairs were structured with a 30% probability of a 2:1 return. Thus, if at

maturity all three option pairs were "in the money" – which was statistically unlikely – the L.

Trading Group would receive a payout of approximately $300,000, representing a return of the

group's original contribution, plus a profit of approximately $150,000. However, the fees

charged in connection with the transaction included a $375,000 fee to E&Y, a $375,000 fee to

the Bolton companies, and a $75,000 fee payable to Law Firm A for a legal opinion.

Accordingly, the L. Trading Group had no realistic possibility to make a profit.

     101.    On or about August 8, 2000, the L. Trading Group's option pairs were

transferred to BCPT&I in accordance with the pre-planned series of steps constituting the Add-

On transaction. On or about November 3, 2000, representatives of L. Trading Group signed a

letter indicating that the L. Trading Group did not wish to participate in "a second round of

digital option purchases." Accordingly, in or about December 2000, the L. Trading Group

withdrew from BCPT&I, and BCPT&I distributed Japanese yen valued at approximately $21,000

to the L. Trading Group. The L. Trading Group exchanged the yen and claimed a tax loss of

approximately $30 million, which loss flowed through to the individual tax returns filed by the

members of the L. Trading Group.

     102.    In or about April 2002, at the behest of E&Y, the managing member of the

L. Trading Group signed a representation letter that had been drafted by Law Firm A. That letter

contained false and misleading representations, including representations that "[t]he Company

regularly engage[d] in investments similar in opportunity and risk to those presented by the

digital foreign currency options," and that "Company management reasonably anticipated a pre-

tax profit" on the transaction. Shortly thereafter, upon payment of a $75,000 fee, Law Firm A

issued a legal opinion that incorporated the false and misleading statements contained in the

representation letter, as well as the false and misleading "cover story" that had been created in

2000 to provide a purported business purpose for the Add On transaction. The opinion letter also

stated that the L. Trading Group's digital currency options could have returned 200 times the

amount contributed by the L. Trading Group (200 x $150,000, or $30 million), and that "[t]he

potential for such a large payout was an important factor in the Company's analysis of the option

trades." In reality, a $30 million payout on the option pairs – while hypothetically possible – was

virtually impossible as a practical matter, and the hypothetical possibility of such a payout played

no role whatsoever in the decision by the members of the L. Trading Group to implement the

Add-On tax shelter.

      103.   In or about early 2002, after the IRS announced its voluntary disclosure

initiative, the two members of the L. Trading Group elected to participate. On or about April 22,

2002, they signed letters that had been prepared by E&Y, in order to disclose their Add-On

transaction to the IRS (the "amnesty letters"). Those amnesty letters, which were signed under

penalties of perjury by each taxpayer and his spouse, were submitted to the IRS, and contained

various false and misleading statements. Among other things, the amnesty letters reiterated the

false "cover story" developed by the conspirators in 2000. The amnesty letters also included the

false statements that the business objective of BCPT&I was capital appreciation; that the

management of the L. Trading Group "was familiar with [digital] options, and in particular, the

opportunity for significant economic returns in proportion to the funds invested"; and that each

taxpayer and his spouse "firmly believe[d] that [their] business purpose for this transaction was

sound and remain[ed] sound."

104.    On August 26, 2003, a representative of the L. Trading Group appeared before the IRS to provide sworn testimony concerning the company's Add-On transaction. During that proceeding, the representative of L. Trading Group gave false, misleading and evasive testimony in order to conceal a number of facts from the IRS, including the fact that the transaction was tax-motivated.

### Statutory Allegations

105.    From in or about January 1, 2000, through at least in or about 2003, in the Southern District of New York and elsewhere, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, and CHARLES BOLTON, the defendants, unlawfully, wilfully and knowingly did aid, abet, counsel, induce and procure an attempt to evade and defeat a substantial part of the income tax due and owing by the members of the L. Trading Group to the United States of America for calendar year 2000, by various means, including among others:

a)    designing and implementing a tax shelter transaction which they knew had no reasonable possibility of generating a profit;

b)    using that tax shelter to generate a total of approximately $30 million in tax losses which they knew could not properly be deducted on the returns of the L. Trading Group members;

c)    creating an entity (BCPT&I) that served no legitimate business purpose, but was used merely to obtain tax benefits for clients as well as fees for E&Y, the Bolton companies, Law Firm A and others;

d)    causing to be prepared, and causing to be signed and filed, false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, for calendar year 2000, which understated each member's taxable income and the tax due and owing thereon; and

e)    preparing, executing, and causing the execution of false and fraudulent documents intended to deceive the IRS, including applications for participation in the IRS's voluntary disclosure initiative.

(Title 26, United States Code, Section 7201 and
Title 18, United States Code, Section 2)


## COUNT THREE

### (Tax Evasion of The C. Partnership)

The Grand Jury further charges:

106.    The allegations set forth in paragraphs 1 through 10, 12 through 18, 27 through 53, 60 through 67, 96 and 97 are repeated and realleged as if fully set forth herein.

107.    Among the entities that participated in the Add-On tax shelter without first having done a CDS shelter was a trading group referred to herein as the "C. Partnership." The C. Partnership consisted of seven partners, most of whom were involved in options trading. In July 2000, E&Y personnel met with representatives of the C. Partnership and offered the partnership the opportunity to defer indefinitely the tax liability of the individual partners on income earned in 2000. The partners decided to use the Add-On strategy to generate a tax loss of $20 million. Because the C. Partnership was a "pass-through" entity for tax purposes, that tax loss could be used by the partners to offset their individual income for 2000.

108.    On or about August 9, 2000, the Bolton companies arranged for the C. Partnership to acquire two pairs of digital currency options. The premiums on the two long options totaled approximately $20 million. The cost to the C. Partnership of the two option pairs (the "net premium") was approximately $100,000, and the maturity date was December 7, 2000. The option pairs were structured with a 30% probability of a 2:1 return. Thus, if at maturity both option pairs were "in the money" – which was statistically unlikely – the C. Partnership would receive a payout of approximately $200,000, representing a return of the group's original contribution, plus a profit of approximately $100,000. However, the fees charged in connection with the transaction included a $225,000 fee to E&Y, a $250,000 fee to the Bolton companies, and a $75,000 fee payable to Law Firm A for a legal opinion. Accordingly, the C. Partnership had no realistic possibility to make a profit.

109.    On or about August 11, 2000, the C. Partnership's option pairs were transferred to BCPT&I in accordance with the pre-planned series of steps constituting the Add-On transaction. On or about November 3, 2000, a representative of C. Partnership signed a letter indicating that the partnership did not wish to participate in "a second round of digital option purchases." Accordingly, in or about December 2000, the C. Partnership withdrew from BCPT&I, and BCPT&I distributed Japanese yen worth approximately $14,000 to the C. Partnership. The C. Partnership sold that asset and claimed a tax loss of approximately $20 million. That loss flowed through to the individual tax returns filed by the partners of C. Partnership for 2000.

110.    In or about early 2002, after the IRS announced its voluntary disclosure initiative, the C. Partnership partners elected to participate. On or about April 22, 2002, they signed letters that had been prepared by E&Y, in order to disclose their Add-On transaction to

-77-

the IRS (the "amnesty letters"). Those amnesty letters, which were signed under penalties of

perjury by each taxpayer and his spouse, were submitted to the IRS, and contained various false

and misleading statements. Among other things, the amnesty letters reiterated the false "cover

story" developed by the conspirators in 2000. The amnesty letters also included the false

statements that the business objective of BCPT&I was capital appreciation; that C. Partnership's

management "was familiar with [digital] options, and in particular, the opportunity for significant

economic returns in proportion to the funds invested"; and that each taxpayer and his spouse

"firmly believe[d] that [their] business purpose for this transaction was sound and remain[ed]

sound."

   111. In or about mid-2002, after the partners had already decided to participate

in the voluntary disclosure program, Law Firm A sent to the C. Partnership a representation letter

to be signed by one of the partners, a draft legal opinion, and a bill for $75,000. The

representation letter contained false and misleading representations, including representations

that "[t]he Partnership regularly engage[d] in investments similar in opportunity and risk to those

presented by the digital foreign currency options," and that "Partnership management reasonably

anticipated a pre-tax profit" on the transaction. The draft legal opinion incorporated the false and

misleading statements contained in the representation letter, as well as the false and misleading

"cover story" that had been created in 2000 to provide a purported business purpose for the Add

On transaction. The draft opinion letter also stated that the C. Partnership's digital currency

options could have returned 200 times the amount contributed by the C. Partnership (200 x

$100,000, or $20 million), and that "[t]he potential for such a large payout was an important

factor in the Company's analysis of the option trades." In reality, a $20 million payout on the

option pairs – while hypothetically possible – was virtually impossible as a practical matter, and the hypothetical possibility of such a payout played no role whatsoever in the decision by the partners of the C. Partnership to implement the Add-On tax shelter. Because the partners had already decided to participate in the voluntary disclosure initiative, they did not pay for, or obtain, a final legal opinion from Law Firm A.

112.    On December 15, 2003, one of the partners of the C. Partnership appeared before the IRS to provide sworn testimony concerning the partnership's Add-On transaction. During that proceeding, the partner gave false, misleading and evasive testimony in order to conceal a number of facts from the IRS, including the fact that the transaction was tax-motivated.

### Statutory Allegations

113.    From in or about January 1, 2000, through at least in or about 2003, in the Southern District of New York and elsewhere, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, and CHARLES BOLTON, the defendants, unlawfully, wilfully and knowingly did aid, abet, counsel, induce and procure an attempt to evade and defeat a substantial part of the income tax due and owing by the partners of the C. Partnership to the United States of America for calendar year 2000, by various means, including among others:

a)    designing and implementing a tax shelter transaction which they knew had no reasonable possibility of generating a profit;

b)    using that tax shelter to generate a total of approximately $20 million in tax losses which they knew could not properly be deducted on the returns of the C.

Partnership partners;

        c)       creating an entity (BCPT&I) that served no legitimate business purpose, but was used merely to obtain tax benefits for clients as well as fees for E&Y, the Bolton companies, Law Firm A and others;

        d)       causing to be prepared, and causing to be signed and filed false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, for calendar year 2000, which understated each partner's taxable income and the tax due and owing thereon; and

        e)       preparing, executing, and causing the execution of false and fraudulent documents intended to deceive the IRS, including applications for participation in the IRS's voluntary disclosure initiative.

        (Title 26, United States Code, Section 7201 and
        Title 18, United States Code, Section 2)

## COUNT FOUR

### (Tax Evasion of T.M. and K.M.)

The Grand Jury further charges:

114.    The allegations set forth in paragraphs 1 through 10, 12 through 18, 27 through 53, 60 through 67, 96 and 97 are repeated and realleged as if fully set forth herein.

115.    Among the E&Y clients who participated in a CDS tax shelter as well as the Add-On tax shelter were T.M. and K.M., a married couple.

116.    In 2000, T.M. held stock options in his company.  Under the tax law, if T.M. elected to exercise those stock options, he would incur an immediate tax liability on the

difference between his purchase price and the fair market value of the stock on the exercise date.

In addition, if he exercised the options, he would be prohibited from selling the stock for a

significant period of time, and thus would not be able to sell stock in order to satisfy his tax

obligation.

117.    In or about July 2000, K.M. spoke with a representative of E&Y, and

learned that if T.M. exercised the stock options, he could use CDS to defer the tax liability on the

stock purchase to 2001, and convert the tax rate to the capital gains rate.  K.M. learned that if

T.M. also implemented CDS Add-On, he could further defer the tax liability beyond 2001.  Thus,

as explained by E&Y, by implementing these shelters, T.M. and K.M. could defer their tax

liability until such time as they could sell the stock, and pay their tax at a lower rate.

118.    Based on E&Y's advice, T.M. exercised his stock options, and

T.M. and K.M. implemented both CDS and CDS Add-On, in order to reduce and defer to a

future year their tax liability on approximately $20 million in income.  On or about July 28, 2000,

they formed a CDS partnership, M. Trading Partners, L.P. ("M. Trading Partners"), with BCP as

its general partner.  As planned, M. Trading Partners entered into two swaps and a loan with a

financial institution, and engaged in trading activity designed to secure "trader" status for the

partnership.

119.    On or about August 8, 2000, the Bolton companies arranged for M.

Trading Partners to acquire two pairs of digital currency options.  The premiums on the two long

options totaled approximately $20 million.  The cost to M. Trading Partners of the two option

pairs (the "net premium") was approximately $100,000, and the maturity date was December 7,

2000.  The option pairs were structured with a 30% probability of a 2:1 return.  Thus, if at

maturity both option pairs were "in the money" – which was statistically unlikely – M. Trading

Partners would receive a payout of approximately $200,000, representing a return of their

original contribution, plus a profit of approximately $100,000. However, fees charged in

connection with the transaction included a $150,000 fee to E&Y, a $150,000 fee to the Bolton

companies, and a $75,000 fee payable to Law Firm A for a legal opinion. Accordingly, M.

Trading Partners had no realistic possibility to make a profit on the Add-On transaction.

      120.    On or about August 11, 2000, M. Trading Partners' option pairs were

transferred to BCPT&I in accordance with the pre-planned series of steps constituting the Add-

On transaction. T.M. and K.M. were sent a "second round of digital option trading" letter, but

did not sign it, thereby indicating that they would retain their membership in BCPT&I into 2001.

In 2001, M. Trading Partners withdrew from BCPT&I, and BCPT&I distributed Japanese yen to

the partnership. M. Trading Partners sold that asset and claimed a tax loss of approximately $20

million, which flowed through to the individual tax return they filed for 2001. In order for T.M.

and K.M. to use the tax losses generated through the Add-On transaction, defendant CHARLES

BOLTON signed a loan agreement on behalf of L. Trading Partners, by which the partnership

purported to borrow $8.5 million from a financial institution. On the same day, T.M. and K.M.

signed documents by which they agreed to be personally liable for the repayment of that loan.

      121.    On September 25, 2001, at the behest of E&Y, T.M. and K.M.

each signed a representation letter that had been drafted by Law Firm A in connection with the

CDS Add-On shelter. The letters contained false and misleading representations, including

representations that they regarded the various activities of their CDS partnership, "including the

swaps, the trading activities, loan, and the investment in [BCPT&I], as comprising one coherent

business philosophy," and that "this diversity of investments was an important element in [their]

decision to invest in the Partnership[.]"

122.    On September 24, 2001, defendant CHARLES BOLTON also

signed a representation letter in connection with the Add-On transaction implemented by T.M.

and K.M.  That letter falsely stated, among other things, that BOLTON intended to utilize the

funds supposedly loaned to M. Trading Partners "as appropriate, to leverage the existing trading

programs of the Partnership and/or invest in other programs designed to yield returns in excess of

the cost of the funds while minimizing risk to capital[.]"

123.    In exchange for a fee of $75,000, Law Firm A issued a legal opinion that

incorporated the false and misleading statements contained in the representation letters signed by

T.M. and K.M., as well as the false and misleading "cover story" that had been created in 2000 to

provide a purported business purpose for the Add On transaction.  The opinion letter also stated

that M. Trading Partners' digital currency options had a potential payout of "many times the

amount of the net premium," and that "[t]he potential for a large payout was an important factor

in the partners' interest in the option trades."  In reality, a payout of "many times the amount of

the net premium" – while hypothetically possible – was virtually impossible as a practical matter,

and the hypothetical possibility of such a payout played no role whatsoever in the decision by

T.M. and K.M. to implement the Add-On tax shelter.  The opinion letter also falsely stated that

the Add-On loan taken out by M. Trading Partners would be used "to opportunistically invest" in

trading programs, and would therefore be deemed a genuine loan for tax purposes.

-83-

124.    In or about early 2002, after the IRS announced its voluntary disclosure initiative, T.M. and K.M. elected to participate. On or about March 13, 2002, they signed a letter that had been prepared by E&Y, in order to disclose their Add-On transaction to the IRS (the "amnesty letter"). The amnesty letter, which was signed under penalties of perjury by T.M. and K.M., was submitted to the IRS, and contained various false and misleading statements. Among other things, the amnesty letter reiterated the false "cover story" developed by the conspirators in 2000, and asserted that the business objective of BCPT&I was to accomplish asset appreciation.

### Statutory Allegations

125.    From in or about January 1, 2000 through at least in or about April 2002, in the Southern District of New York and elsewhere, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN, and CHARLES BOLTON, the defendants, unlawfully, wilfully and knowingly did aid, abet, counsel, induce and procure an attempt to evade and defeat a substantial part of the income tax due and owing by T.M. and K.M. to the United States of America for calendar year 2001 by various means, including among others:

a)    designing and implementing a CDS Add-On tax shelter transaction which they knew had no reasonable possibility of generating a profit;

b)    using that tax shelter to generate more than $19 million in tax losses they knew could not properly be deducted on the returns of the partners;

c)    creating an entity (BCPT&I) that served no legitimate business purpose, but was used merely to obtain tax benefits;

-84-

d)    causing to be prepared, and causing to be signed and filed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for calendar year 2001, which substantially understated T.M. and K.M.'s taxable income and the tax due and owing;

e)    preparing, executing, and causing the execution of false and fraudulent documents intended to deceive the IRS, including applications for participation in the IRS's voluntary disclosure initiative; and

f)    taking various other steps to conceal from the IRS the true facts relating to the tax shelter, including providing false information in response to IDRs.

(Title 26, United States Code, Section 7201 and
Title 18, United States Code, Section 2)

## COUNTS FIVE THROUGH SEVEN

### (Tax Evasion of E&Y Partners)

The Grand Jury further charges:

126.    The allegations set forth in paragraphs 1 through 10, 13 through 20, 27 through 34, 68 through 82, 96 and 97 are repeated and realleged as if fully set forth herein.

127.    From in or about 2000, through at least in or about 2003, in the Southern District of New York and elsewhere, ROBERT COPLAN, MARTIN NISSENBAUM, and RICHARD SHAPIRO, the defendants, unlawfully, wilfully and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by each of them to the United States of America for calendar year 2000, as set forth below, by various means, including among others:

-85-

a)     designing and then implementing a tax shelter transaction which they knew had no reasonable possibility of generating a profit;

b)     using that tax shelter to generate tax losses they knew could not properly be deducted on their respective tax returns;

c)     creating entities that served no legitimate business purpose, but were used merely to obtain tax benefits;

d)     preparing and executing false and fraudulent documents intended to deceive the IRS, including but not limited to transactional documents and a Certificate of Facts;

e)     preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed a false and fraudulent U.S. Individual Income Tax Return, Form 1040, which substantially understated each defendant's taxable income and tax due and owing; and

f)     taking various steps to conceal from the IRS the true facts relating to the tax shelter, including providing false information in response to IDRs sent by the IRS.

| Count | Defendant/ Taxpayer | Return | Approx. Amount of Fraudulent Underpayment | Approx. Filing Date |
|---|---|---|---|---|
| 5 | ROBERT COPLAN | 2000 Form 1040 | $ 291,913 | April 15, 2001 |
| 6 | MARTIN NISSENBAUM | 2000 Form 1040 | $ 340,262 | April 16, 2001 |
| 7 | RICHARD SHAPIRO | 2000 Form 1040 | $ 201,565 | August 16, 2001 |

(Title 26, United States Code, Section 7201)

## COUNT EIGHT

### (Obstruction of the IRS)

The Grand Jury further charges:

128.    The allegations set forth in paragraphs 1 through 10, 13 through 20, 27 through 34, and 68 through 82, 96 and 97 are repeated and realleged as if fully set forth herein.

129.    On or about September 25, 2003, in the Southern District of New York and elsewhere, MARTIN NISSENBAUM, the defendant, unlawfully, wilfully, and knowingly did corruptly obstruct and impede, and did endeavor to obstruct and impede, the due administration of the Internal Revenue Code; to wit, in response to IDR #2, NISSENBAUM caused the false and misleading statements set forth in paragraph 82, above, to be submitted to the IRS on behalf of himself and ten other E&Y partners.

(Title 26, United States Code, Section 7212).


## COUNT NINE

### (Obstruction of the IRS)

The Grand Jury further charges:

130.    The allegations set forth in paragraphs 1 through 10, 13 through 20, 27 through 34, 64, 65, 96 and 97 are repeated and realleged as if fully set forth herein.

131.    On or about July 17, 2001, in the Southern District of New York and elsewhere, ROBERT COPLAN, the defendant, unlawfully, wilfully, and knowingly did corruptly obstruct and impede, and endeavor to obstruct and impede, the due administration of the internal revenue laws, to wit, with knowledge that one of E&Y's COBRA transactions was

-87-

then under audit, and that the IRS had formally requested production of COBRA promotional

materials, COPLAN sent an email directing PFC professionals and others throughout the country

immediately to "delete and dispose of" COBRA materials in their files and their computers.

(Title 26, United States Code, Section 7212).


## COUNT TEN

### (False Statements To The IRS)

The Grand Jury further charges:

132.    The allegations set forth in paragraphs 1 through 10, 13 through 18, 21

through 67, 96 and 97 are repeated and realleged as if fully set forth herein.

133.    On or about June 12, 2002, in the Southern District of New York and

elsewhere, BRIAN VAUGHN, the defendant, in a matter within the jurisdiction of the executive

branch of the Government of the United States, unlawfully, wilfully, and knowingly made

materially false, fictitious and fraudulent statements and representations, to wit, in connection

with an examination by the IRS of tax shelters marketed by Ernst & Young, VAUGHN gave the

false testimony underlined below:

(Page 22, line 17)

|  | Q. | How did you get involved in these digital option transactions? |
|---|---|---|
|  | A. | Mainly from our clients. Our clients, as I mentioned before, were getting bombarded by a couple of other accounting firms. And they would – it would bubble up to us, and come to the client service professional, and they'd call and say, "Hey, look. My client is being called on on these various solutions. We need an answer. Does it work or doesn't it? And what is the firm's position?" And so |
| (a) |  | that's how we were first introduced to the concept. Other time – to my knowledge, there was one other time when a fund was created, and certain of our |

-88-

<u>high net worth individuals were offered the potential to go into the fund, so that</u>
<u>came through a broker-dealer.</u>

* * * *

(Page 31, line 13)

Q.  [D]o you know anything about the fees that investors paid to enter into these
[digital option] contracts?  I already asked about the premium amounts, but do
you know any fees that were paid to [financial institution], fees that were paid to
[bank]?  Were there any standard fees?

A.  Like I said, I think the counterparty did take a fee for the execution.  There was a
tax fee for the tax advice, and for – for future examination, if they were to be

**(b)** examined.  <u>We would forecast what we thought our time and expense would be</u>
<u>to go through an examination process with that specific client.</u>  So our – there was
a tax fee paid to Ernst & Young, there was a fee paid to the attorney, whichever
attorney they chose to issue the tax opinion.  And then there was, I'm sure, the
investment fees that – whoever the counterparty would charge.

Q.  Was Ernst & Young's fees fixed fees?

**(c)**  A.  It was fixed per client, but they were negotiated fees.  <u>As always, we try to start</u>
<u>with our 100 percent per diem billing rates, but we never somehow got there.  So</u>
<u>but on all our solutions, whether it is wealth management, which is our personal</u>
<u>CFO service, whether its investment advisory services, we always do a front-end</u>
<u>work plan, sort of a budget, on here is the various professionals in the national</u>
<u>group, in the local group, in the area groups, what their billing rates are, how much</u>
<u>time that we would think to expend on a particular transaction.  And then we try to</u>
<u>back that into a fixed fee, because we found our clients liked fixed fees</u> rather than
open-ending, you know, invoice, invoice me at your will, and it keeps coming.  So
all of our engagement letters, for whatever we do, is fixed.

* * * *

(Page 49, line 10)

Q.  Who developed the structure ... of the digital currency option trade?

A.  The digital option trade, I believe, was – [Law Firm] actually approached one of

-89-

our clients with that. . . . [I]t was either [Law Firm], or it was Arthur Andersen had approached one of our clients that had this particular program, then it came bubbling up to us. Then we had to assess whether our client should go into this particular transaction. . . .

Q.     So did E&Y develop its own brand?

**(d)**     A.     <u>No. The only thing we do is, again, we look at the tax issue surrounding how the proposed structure is.</u>  And if we can get to a filing position, then we will tell the client service professionals that we believe we can sign this return.  But we don't –

**(e)**     we – <u>since day one, the only solutions that I know that we have created ourself is wealth management solutions, investment advisory services, equity risk management services.  But there was no tax strategy, per se, that was developed internally by our individual tax practice.</u>

* * * *

(Page 53, line 4)

Q.     Are you familiar with BCP Trading and Investments, LLC?

A.     BCP Trading and Investments, LLC?  That sounds like – sounds like one of the funds that Chuck Bolton used for one of the, seems like, one of the clients for the swap, but I can't recall specifically.  Sounds like a Bolton entity.

Q.     So you don't know anything about the structure of the LLC of BCP Trading and Investments, LLC?

**(f)**     A.     <u>All I know was to the best of my knowledge, that entity was structured by Chuck Bolton as a private offering to clients, whether they were clients of Ernst & Young or clients of, you know, Chuck Bolton's, et cetera, to participate in foreign currency trading.  That's my knowledge of it. . . .  But I know that that was one where Chuck felt that he could take advantage of the dollar-yen movements and some Euro-yen movements, and felt that he came to us and said, look, I've got this private offering, a fund that I want to set up, and do you have any high net worth clients that could participate?  I'm offering it to, you know, sort of a universe of people.  That was my knowledge of it.</u>

* * * *

-90-

(Page 61, line 11)

      Q.     Were subject matter specialists involved in the digital currency option trade?

**(g)**    A.     Oh, I'm sure. <u>That's why I was trying to remember who the right subject matter person on that would have been.</u> I -- but yes. There had to have been a subject matter expert involved in every -- if it was -- involved a tax strategy that the client was looking at, then it had to go to the appropriate subject matter expert on that.

* * * *

(Page 67, line 3)

      Q.     Did E&Y ever develop its own investment strategies that it would then pitch to its own clients, similar to the way you described it earlier, that, let's say, Arthur Andersen went to one of your clients?

      A.     Well, we have investment advisory services, which we believe is our propriety [sic] investment advisory solution. That's where we've gone out and we've contacted what we believe is the best agreed money managers, we got them to reduce their minimums that a client could get into that specific manager, and we got them to reduce their fees that they would charge off the street, because we felt our clients -- we could bring a lot of clients to them. . . . So that is our investment -- when you say have we developed an investment alternative for our clients, that is one that we developed in-house and we are taking out to our clients to market for investment advisory services.

      Q.     But the digital currency option trade did not come out of that group?

      A.     No. No. That was, again, brought to us by an outside organization.

      Q.     And who was that?

**(h)**    A.     Again, <u>Chuck Bolton came to our clients with a fund to participate in.</u> That was one instance. And, again, the other instance is when a client was shown a digital option strategy, and [Bank] had been, you know, the counterparty with that.

* * * *

(Page 70, line 21)

      Q.     So it would be someone like Bolton that would develop [a swap transaction] and bring it to E&Y?

**(i)**    A.    Yeah.  That would be for one instance, yeah.  <u>Bolton would have a – I mean,</u>
<u>because they did.  They created a fund, and they brought it to a client – the client of</u>
<u>the firm.  And of course, that client service professional says hey, what do you</u>
<u>think of this.  And that's you know, how the process works.</u>

* * * *

(Page 71, line 22)

    Q.    Did Bolton bring . . . the digital currency option trade to E&Y?  Was it Bolton who
approached the client of yours?

**(j)**    A.    Bolton approached the client with a fund, with a private offering memorandum that
dealt with foreign currency trading, which included some, you know – with the
digital, whether American, European, it was a foreign currency fund.

* * * *

(Page 84, line 4)

    Q.    How did you – how did E&Y determine its fees when it came – or did it – with its
consulting fees for, let's say, is it done on a transaction-by-transaction basis?

    A.    Client by client.

    Q.    Client by client.  For providing tax advice on –

    A.    Yes.

    Q.    – let's say, that – the digital currency option trade, the client came to you and said,
"Can you look at this and let me know what you think," how would you determine
the fees?

**(k)**    A.    <u>Time and expense, and forecasting, again, as I mentioned before.</u>  Part of our
engagement was not only to consult with them to give them tax advice on their
specific investment, but also to build in, if we thought there was a high likelihood
of examination, we were not just going to, you know, bill them again.  So we had
to try to best estimate what our fee is going to be, based on the time that we would
incur from a national perspective, you know, defending the client.

    Q.    And –

    A.    Then we would fix – then it would be a fixed fee.

    Q.    How would you determine the fixed fee?  Was there any kind of formula used?

-92-

(l)   A.   Well, again, with each – <u>every time that we go about working on a solution, we come up with a budget, sort of a work plan.  It involves the level of personnel assigned to it, their appropriate billing rate, the hours that we estimate it's going to expend with that particular client, and then we come to our best guess of what that is from a fixed fee standpoint, and the margin that we want, you know, from a business perspective</u>.  If we want a 15 percent margin or 10 percent margin, that affects, obviously, from a pricing standpoint, what we want.  We got to have a business, you know.

       Q.   None of that fee was ever based on a tax savings?

(m)   A.   <u>No.</u>  We never – our policy as a firm is not to take a percentage of tax savings.  So we, from an individual perspective, – and I can't speak to what other groups in Ernst & Young but only the PFC practice, we take no contingent fees and <u>we don't take a percentage of tax savings</u>.  Now, the fixed fee may be a percentage of their investment, because a lot of times the private offering memorandum will have to state all fees associated with it.  And the normal rule of thumb on how private offering memorandums is always related back to the fixed fee as a percentage of your invested capital.

* * * *

(Page 87, line 8)

       Q.   Let's go back to the Bolton fund, that type of transaction that then went to your client, and you did your review, came back with a more likely than not, and then determined that it could work for X amount of clients, how would you then bill your time when you presented it to your – the various clients?

(n)   A.   Client by client. . . .  <u>So it's all determined in about – the team assigned to that client, how many hours they anticipate there's an amortization of the research and development time, there's forecast for defense.  But really, it's client by client by client, because we don't know how this particular investment is going to fit with their overall financial plan. . . . I have never seen a cookie-cutter deal.  You know, I've never seen, you know, let's just replicate this, because every client's demands are so unique.</u>

* * * *

-93-

(Page 100, line 11)

Q.    Do you know Robert Copeland [sic]?

A.    Yes.  He is our subject matter expert in estate and gift tax area.

Q.    So would he have been involved in this transaction [CDS Add-On]?

(o)  A.    If it dealt – maybe tangentially, because his expertise is estate and gift.  I think – I'm sure – I'm sure Bob was involved to some extent.  To what his personal involvement was, I don't know.  Because anything dealing, you know, with a fund that affects a person's gift and estate tax ramifications, definitely Bob could have been called.  . . . Bob probably did get called, but I don't know.  I don't know.

* * * *

(Page 103, line 14)

Q.    Did E&Y ever come out with a more likely than not conclusion to any deal that he –

A.    One.

Q.    One.  Okay.  Which one?

A.    That was a swap with Bolton.

Q.    What was Bolton's role in the swap?

A.    Execute.  They executed the swap. . . .

Q.    Do you know what type of entity would have been used to facilitate the swap?

A.    I think most of the time it was either LLCs or limited partnerships or general partnerships.

Q.    Do you know why you would use that type of entity?

(p)  A.    Client choice.  Either client choice or the recommendation of client counsel.

* * * *

(Page 107, line 20)

Q.    And there was the name of someone that you had mentioned before that had left E&Y that worked – Belle Six, I think you –

A.    Yeah.  She was an employee I think in 1998, and then pursued other –

Q.    Where did she go?

(q)  A.    I couldn't tell you.  I don't know where she is.

-94-

* * * *

(Page 126, line 12)

    Q.    So who would bring all the parties to the transaction together, be it, you know, the broker-dealer, who would bring that entity in?

**(r)**    A.    Well, for instance, on the fund that we talked about earlier, [Company X] already had all the pieces together from the investment standpoint.  And so they were bringing the transaction to us.  So they had already put – you know, they had put everything together from the investment standpoint, the private offering memorandum, et cetera.

* * * *

(Page 136, line 6)

    Q.    Do you recall what the probability of a tax benefit was?

**(s)**    A.    No, I don't recall.

* * * *

Page 138, line 21)

    Q.    Would you give any advice to clients as to timing of exiting?

**(t)**    A.    I think that was – well, only from an investment standpoint.  Obviously, if they were making money, stay in.  If they were losing money, let's look at alternatives.

    Q.    In terms of tax benefits, though?

**(u)**    A.    No.  I mean, this was an investment for the client.  So our advice was centered around if you're going to – if you believe this is a good investment and it makes sense, stay in.  Continue to do, you know, to do the digital trading, do the foreign currency trading.  If it doesn't make sense, let's think about exiting and how should we exit.

* * * *

(Page 139, line 22)

    Q.    Do you know if clients withdrew from it?

    A.    Yes.  I do know clients withdrew from it.

-95-

        Q.     Do you know what the basis would have been for withdrawing from it?

(v)    A.    <u>Lack of profit.</u>

* * * *

(Page 142, line 9)

        Q.     When you were determining the entrance, . . . [h]ow would you calculate what their contribution would be?

        A.     I think a lot was dictated on how much percentage profits that they wanted in the fund, and how much they felt comfortable with contributing.

        Q.     What are the types of assets that they were contributing?

        A.     If I remember the fund, the fund was a digital, foreign currency digital program. . . .

        Q.     Where did they get the options from?

(w)    A.    <u>Well, the digital options were purchased as part of their, from the investment standpoint, as part of their alternative investment, you know, that was just part of their investing.</u>

* * * *

(Page 165, line 6)

        Q.     Are you aware of any of the listed transactions that your clients engaged in prior to them being listed?

        A.     [Looking at Notice 2001-51] Yes.

        Q.     Do you know which ones?

        A.     CDS, I think, just got listed, if I remember right, is a listed transaction, the swap transaction.  . . .

        Q.     Are you familiar with any of the other ones? . . . What about No. 11, the Notice 2000-44?

(x)    A.    Inflating the basis of partnership interests?  <u>I don't think we did any inflation of partnership interest.</u>

* * * *

-96-

(Page 169, line 8)

Q,    I'm going to get off the list of transactions and ask whether at any time did you
ever consult an E&Y database for strategy?

A.    An E&Y database for strategy. Trying to think. Database. We have – if the client
asked for a – trying to think what an example would be – an engagement letter,
then we would have  – there is a repository for engagement letters so that we
wouldn't have to duplicate that effort. . . .

Q.    Where would that be?

A.    That is in a just – I think it's a general PFC database. And you're talking to
someone that's administratively, again, very weak in this. . . . So, yeah, I do think
there's a PFC database that would have engagement letters there.

Q.    Would there be a database where after you review, say, the currency, the fund,
where you could let everyone out there in the country know that hey, this is a good
vehicle for your clients if you have someone that wants it?

(y)   A.    Other than email? <u>I don't know.   I mean, if a client – see, everything was driven
from the client's perspective.   So if the client came to the client service
professional and said, you know, we've got this that's – you know, got this fact
pattern, or whatever, and then they call the subject matter expert, the subject matter
expert said send them an email, look, this has been done for another client and, you
know, the fact pattern sounds similar, you may want to investigate this particular
deal[.]</u>

\* \* \* \*

(Page 176, line 4)

Q.    [T]ake just a digital currency option trade as an example, would that fit into the
definition of a solution?

(z)   A.    <u>That would be a one off tax strategy.  So, in other words, there would be no
database or this thing formed for digital option, because it was a one off investment
fund that was produced by a third party that came to us.</u>   Most of our solutions, I
think almost all the solutions are internally developed.  So a solution is just a way
that Ernst & Young has been doing a service, it needs to be standardized.  If it was
a tax strategy that was brought to us by a third-party vendor, that's not a solution
per se.  We used to call it just, you know, a tax strategy.

-97-

Q.     Did Ernst & Young create its own tax strategies?

**(aa)**     A.     Unfortunately, <u>no.  We – the only, I guess, strategies, per se, a Chuck Bolton would have brought to us.</u>

\* \* \* \*

Page 186, line 22)

Q.     Would – back to the fund, the Bolton fund . . . – the eight to ten that you actually were involved in . . . did each client approach E&Y to engage in the fund?

**(bb)**     A.     <u>For financial planning assistance.  They would have come to their relationship person and said, you know, for whatever reason I've got this fact pattern.  And then the relationship person would say, "Hey, Brian, you know, this is the fact pattern." Well, if I was aware this fund was being offered, I'd say, "Well, look, you need to probably check with Chuck Bolton, see if the facts of this make sense for you."  If it was an investment planning professional that had done an asset allocation, said we need to look at a hedge fund, you know, Chuck Bolton's hedge fund at that time would have been one that they probably would have considered.   So it really just, you know, it really depended upon the risk tolerance of the client from an investment perspective and whether a hedge fund fit in their asset allocation.</u>

(Title 18, United States Code, Section 1001).

## COUNT ELEVEN

### (False Statements To The IRS)

The Grand Jury further charges:

134.     The allegations set forth in paragraphs 1 through 10, 13 through 18, 21 through 67, 96 and 97 are repeated and realleged as if fully set forth herein.

135.     On or about June 20, 2002, in the Southern District of New York and elsewhere, ROBERT COPLAN, the defendant, in a matter within the jurisdiction of the executive

-98-

branch of the Government of the United States, unlawfully, wilfully, and knowingly made

materially false, fictitious and fraudulent statements and representations, to wit, in connection

with an examination by the IRS of tax shelters marketed by Ernst & Young, COPLAN gave the

false testimony underlined below:

(Page 24, line 10)

Q.    Who produced the materials [to be distributed to clients] for the Bolton transaction.
      . . . a description of the transaction that you would give to investors before they
      invest --

A.    Yeah.  On the Bolton transaction, there were no materials given.  That was just
      explained. . . .  I believe 1 office did produce something, and it was on their own
      and without national involvement. . . .

Q.    What office was it?

A.    Seattle.

Q.    Did you review any of those materials?

A.    I did after I became aware of them, but not for distribution.  In other words, I
      basically said, these are not to be distributed.

Q.    And why did you say they were not to be distributed?

(a)   A.    We didn't see the need to, and anything – or even show it to clients.  We didn't
            think the transaction was that complicated, to be honest with you, so we only really
            had it for internal purposes.

* * * *

(Page 34, line 9)

Q.    And who was the counterparty in most of these [CDS Add-On transactions]?

A.    I believe it was [Financial Institution] in both transactions.

Q.    And [Financial Institution] is a U.S. entity?

A.    Again, I've become aware there was some confusion about that . . . .  On the
      [Company X] transaction, it was really being – all the investments aspects of it
      were being done in connection with the existing partnerships.  And those existing
      partnerships had trading accounts that were doing exotic option trading and other

(b)         trading, and so – and Ernst & Young had nothing really to do with the operation of
            that partnership.

-99-

Q.  M-hm.

A.  So Bolton was the asset manager. Bolton was not necessarily at the time, but they became the general partner also of those accounts during the period in question. And so they were leading the investment decisions of who to use, and they were using a trader who specialized in these type of currency options. And so we

**(c)**   really didn't – we, Ernst & Young, really didn't have involvement in the decisions that the general partner made as to who to use to do the trading, how to structure those trades. It was really their investment decision and their decision as general partner. They didn't have to ask us anything.

* * * *

(Page 38, line 11)

Q.  What were the risks on the tax transaction?

A.  That the IRS would disagree, that you had basis in the partnership.

Q.  What did you think the IRS would – just on the basis issue alone, that's what you thought the issue would be?

A.  Yeah. But I think in the explanations that have been put forth of the facts and amnesty disclosures, et cetera, on this transaction, the surrounding facts were such

**(d)**   that when we analyzed it, we looked at the fact that the partnerships were existing partnerships, they had been doing some of this trading, and that there was going to be a transfer of a portion of the trading accounts to this [Financial Advisor] outfit for management, and he said, I'm not going to manage a whole bunch of these little accounts, I'm going to put all of these things into an LLC so I can do 1 account trading for these options. And it was 1 of those circumstances where his tax planner – as we say, we're aware of this idea that's out there. We hear about the concept of transferring a long and a short option that aren't matched and getting basis and not having to reduce it for the liability, and so here was kind of a fortuitous circumstance where if these accounts are going to be transferred into an entity anyway, that it's a matter of taking the tax position, because along with that transfer, if someone felt appropriate to do it.

* * * *

-100-

(Page 62, line 7)

Q.    So how did Bolton get involved in the option transaction?

A.    Bolton got involved – this was later on after David Smith brought the idea to us. So in other words, we had the idea. That's why I said at some point, we kind of married an idea with facts in the Bolton transaction, so that it was what we did with Bolton. But we had the idea at some previous time from David Smith.

Q.    Okay. So maybe I asked this: How did Bolton actually come to do the transaction? Did you have – is this based on a preexisting relationship with Bolton?

A.    Yeah. I mean, I said we – Bolton was involved in the swap partnerships.

Q.    Okay.

A.    And so they were involved as the asset allocators and the investment folks. And they were dealing with these trading-type people like [Financial Advisor] is the 1 involved.

(e)    And so we're the tax advisors, and we said, hey, if you are happening to be forming these – transferring these trading accounts over to [Financial Advisor] and he's going to put them in an LLC, we know this tax idea. That's kind of what I said before.

* * * *

(Page 98, line 6)

Q.    Were clients concerned about the large capital gain at the end of the [CDS] transaction in that they would have a large amount to pick up in income that year?

(f)    A.    That was – well, they weren't sure that that would happen, because they had to make a decision on the economic side to – they would have to decide to early-terminate the swap, because the swap was scheduled to run for 18 months. And so a decision was required on their part or the counterparties' part to terminate the swap prior to the majority. Otherwise, you'd have ordinary income on the back end.

Q.    Did – do you know, did all the partnerships terminate early?

A.    I believe they did.

* * * *

-101-

(Page 118, line 116)

> Q.   Was there a reason why [the Add-On transaction] was done through an LLC and not for the Jenkens partnerships for lack of a better description?
>
> A.   Well, as I think I explained, the – well, the Jenkens came first.  They were done with individual folks forming a partnership.  And they did their ... currency contracts and contributed them to partnerships.  The [Add-On] transaction wasn't really done that way.  It was done based on the fact that the partnerships were transferring their trade – I mean, it really was a fact that existed prior to the tax idea.  In other words, the LLC was formed as an LLC because of Mr. [K's] interest in forming an LLC for all those trading accounts. . . .  For the – for all those partnerships that were doing this type of trading that Bolton said, we can't use [Financial Institution] anymore to do this kind of trading, we've got to move the trading account over to [Financial Advisor].  And so they moved it and he said, if I'm going to do this trading for you, I'm going to have all these accounts in 1 entity.

**(g)**

* * * *

(Page 139, line 12)

> Q.   Who would pay E and Y fees [for PICO], the individual or the S Corp?
>
> A.   We had an engagement letter with the individual.
>
> Q.   The individual was responsible for paying the fees?
>
> A.   We were paid by the individual.  We also received a fee from [Company Z] for consulting with them on the transaction. . . .  We were advising them on the tax aspects of the results of investors investing in these types of S corporations.

**(h)**

(Title 18, United States Code, Section 1001).

## COUNT TWELVE

### (Tax Evasion of David L. Smith)

The Grand Jury further charges:

136.    The allegations set forth in paragraphs 11, and 21 through 23 are repeated and realleged as if fully set forth herein.

137.    During 1997 and 1998, before defendant DAVID L. SMITH founded PCMG, he was the part owner of a so-called "investment advisory" firm referred to herein as "Q Advisors." At that time, Q. Advisors was involved in designing, marketing and implementing tax shelters, including CDS.

138.    As of January 1998, SMITH owned his interest in Q. Advisors through two layers of entities. The first entity was S&L Advisors, LLC (S&L Advisors), which was a 50% owner of Q. Advisors. S&L Advisors, in turn, was owned by two other entities: 1) the Smith Family Trust (the 99% owner of S&L Advisors), a pass-through entity for tax purposes, which was controlled by SMITH; and 2) S&L Advisors, Inc. (the 1% owner of S&L Advisors), another pass-through entity which was also controlled by SMITH.

139.    In 1998, S&L Advisor's share of the income earned by Q. Advisors was $18.4 million. Based on the structure described in paragraph 138, above, the $18.4 million paid to S&L Advisors should have passed through to defendant DAVID L. SMITH, and been reported as income by SMITH on his individual income tax return.

140.    During the period from mid-1998 through at least July 2003, defendant DAVID L. SMITH took numerous steps to evade the tax on the $18.4 million paid by Q. Advisors to S&L Advisors. Among other things:

a)    In mid-June 1998, SMITH set up a Cayman Islands entity called "Aegis Capital Investments Ltd. ("Aegis"), which was controlled by SMITH, but was designed to appear as though SMITH had no control over it or relationship to it;

b)    In mid-June 1998, SMITH set up one or more accounts in the name of Aegis in the Cayman Islands;

c)    On or about June 26, 1998, SMITH engaged in a sham sale of the Smith Family Trust's 99% interest in S&L Advisors to Aegis, a step which appeared to give an unrelated company the right to receive SMITH's portion of the income from Q. Advisors. SMITH thereafter directed Q. Advisors to transfer S&L Advisors' income to a Cayman Island account opened in the name of Aegis;

d)    In August 1998, SMITH arranged to implement a CDS-type transaction on behalf of S&L Advisors, using a $20 million swap (including an $18 million "loan" from a bank) to defer from 1998 to 1999 the tax liability on the income from Q. Advisors;

e)    On or about January 5, 1999, the day S&L's swap terminated, SMITH directed that the cash proceeds of the termination payment be transferred to the Aegis account in the Cayman Islands;

f)    On or about October 15, 1999, SMITH signed and filed a 1998 tax return (a Form 1065) on behalf of S&L Advisors, on which he reported the $18.4 million in income from Q. Advisors, but also reported $19.9 million in deductions from the CDS swap, resulting in zero taxable income;

g)    Although SMITH knew that the proceeds of S&L's CDS swap had been paid to S&L Advisors in January 1999, and that the full amount of the termination payment

was reportable as income to S&L Advisors in 1999, SMITH indicated on the 1998 return he

signed and filed on behalf of S&L Advisors that the return was a "Final return," thus indicating to

the IRS that S&L anticipated no reportable income in 1999;

h)      On or about October 15, 1999, SMITH signed and filed a 1998

individual income tax return (Form 1040) on behalf of himself and his spouse, on which he

reported zero taxable income and claimed a refund;

i)      Although SMITH owned and controlled one or more Aegis

accounts in the Cayman Islands during 1998, on his 1998 individual income tax return, where the

return asked whether at any time during 1998 SMITH had "an interest in . . . or other authority

over a financial account in a foreign country," SMITH indicated "No."

j)      In or about April 2002, an individual income tax return for 1999

was prepared for SMITH by a tax preparer in New York, New York. SMITH filed but did not

sign the return. The return did not report the $19.9 million swap termination payment made to

S&L Advisors on January 5, 1999.

k)      On the 1999 individual tax return filed by SMITH in April 2002,

where the return asked whether at any time during 1999 SMITH had "an interest in . . . or other

authority over a financial account in a foreign country," SMITH indicated "No."

l)      On or about November 5, 2002 and November 6, 2002, in

connection with a civil audit of SMITH's tax liabilities, SMITH was interviewed by an IRS

revenue agent. During that interview, SMITH told the revenue agent that he had sold his interest

in S&L Advisors to Aegis, and that SMITH had no interest in Aegis.

-105-

m)    On or about December 1, 2002, SMITH signed and filed his individual income tax return for 2000. Where the return asked whether at any time during 2000 SMITH had "an interest in . . . or other authority over a financial account in a foreign country," SMITH indicated "No."

n)    On or about July 19, 2003, SMITH signed a declaration, under penalties of perjury, that he had examined his 1999 individual income tax return and that, to the best of his knowledge, it was true, correct and complete.

## **Statutory Allegations**

141.    From in or about January 1, 1998, through at least on or about July 19, 2003, in the Southern District of New York and elsewhere, DAVID L. SMITH, the defendant, unlawfully, wilfully and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by him to the United States of America, on $18.4 million he earned from Q. Advisors, by various means, including among others:

a)    creating and utilizing an off-shore entity designed to disguise his receipt and control of the $18.4 million from Q. Advisors;

b)    entering into a tax shelter transaction to defer his tax liability on the $18.4 million from 1998 to 1999, with the intent not to report the income in 1999;

c)    causing to be prepared, and causing to be signed and filed, false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, which understated his taxable income and the tax due and owing thereon, and which concealed his interest in, and authority over, the foreign bank account or accounts into which the income from Q. Advisors had been

-106-

transferred; and

        d)     making false statements to an IRS revenue agent in connection

with an audit of his tax liability.

        (Title 26, United States Code, Section 7201).

## COUNT THIRTEEN

**(False 1999 Tax Return Filed by David L. Smith)**

    142.    The allegations set forth in paragraphs 11, 21 through 23, and 136 through 140 are repeated and realleged as if fully set forth herein.

    143.    From in or about April 2002, up to and including July 19, 2003, in the Southern District of New York and elsewhere, DAVID L. SMITH, the defendant, unlawfully, willfully and knowingly did make and subscribe a U.S. Individual Income Tax Return, Form 1040, on behalf of himself for calendar year 1999, which was verified by a written declaration that the return was made under penalties of perjury, which was filed with the Internal Revenue Service, and which SMITH did not believe to be true and correct as to every material matter, in that, among other things, the return indicated that during 1999, SMITH had no interest in, or other authority over, a financial account in a foreign country.

        (Title 26, United States Code, Section 7206(1).)

FOREPERSON

MICHAEL J. GARCIA
United States Attorney

-107-