UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                      :

UNITED STATES OF AMERICA

                      :

   v.

                      :    (s1) 07 Cr. 453 (SHS)

ROBERT COPLAN
MARTIN NISSENBAUM           :
RICHARD SHAPIRO, and
BRIAN VAUGHN              :

      Defendants          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MEMORANDUM IN SUPPORT OF
DEFENDANT ROBERT B. COPLAN'S
MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT 7

## I.  INTRODUCTION

      Count Seven of the redacted Superseding Indictment ("SI") alleges that Mr.

Coplan "knowingly made materially false, fictitious and fraudulent statements and

representations" in a matter within the jurisdiction of a federal agency,  "to wit, in

connection with <u>an examination by the IRS of tax shelters</u> marketed by Ernst & Young" in

violation of 18 U.S.C. §1001. (emphasis added)  SI, ¶64.  The alleged false statements

relate to five subjects:

- The reason why no written materials were given to clients in connection
  with the "Bolton transaction."[1]  SI, ¶64(a).

- Whether Ernst & Young had "anything to do with" the operation of the
  general partnership involved in that transaction.  ¶64(b)(c).

---

[1]  The SI uses the term "Bolton transaction" to refer to what has been referred during trial as the "Add-On."

- The origin of the idea for the Add-On transaction. ¶64(d), (e), (g)

- Early termination of the CDS swaps. ¶64(f).

- The basis for Ernst & Young's fees in the PICO transaction. ¶64(h).

As discussed *infra,* testimony at trial has established that certain of Mr. Coplan's statements were unequivocally not false. However, even were that not the case, Mr. Coplan is entitled to judgment of acquittal on Count Seven because the government has presented insufficient evidence from which a jury could conclude beyond a reasonable doubt that the statements in issue were material.

## II. FACTS

The sole evidence offered about the proceeding  in which Mr. Coplan's testimony was taken came through the witness Vincenza Taverna-Ciarlo ("Ms. Taverna"). The evidence establishes that:

1. In the spring of 2002, the Internal Revenue Service commenced an examination of Ernst & Young (EY)'s potential liability for penalties under sections 6707 and 6708 of the Internal Revenue Code ("Code"). *TR. 3663.*   On April 23, 2002, the IRS served Ernst & Young with 17 administrative summonses related to that matter, which were identical except that each summons related to a different transaction. *TR. 3648/1011.* Two examples of the summonses were offered into evidence.  *GX337, GX 340.*  Both summonses recited that they were issued "In the matter of the liability of Ernst & Young for IRC sections 6707 and 6708 penalties."  One summons (GX 337) sought materials and testimony related to "Notice 2000-44 Transactions", and the other (GX 340) sought the same for "potential tax shelter transactions."  The others related to other "listed transactions." *TR.  3666/3-9.*

2

2.  The examination that the Internal Revenue Service was conducting concerned the potential liability of Ernst & Young for penalties under the specified Code sections. It was not a "generalized fishing expedition."  *TR. 3677/3-8.*

3.  Section 6707 of the Code provides for a penalty for failure to register a tax shelter, as "shelter" is defined in the relevant regulations.  *TR.  3667/24-3668/1.*  In general, the regulations define a tax shelter subject to registration as one involving a "tax shelter ratio" of greater than 2:1, which involves an amount in excess of $250,000, and which is offered to more than a minimum number of persons.[2]  Determining whether the "tax shelter ratio" has been met involves the application of a mathematical formula.  *TR. 3668/3-3670/11.*

4.  Section 6708 of the Code, as it applied to transactions entered into before February 23, 2003,  provided for a penalty for the failure to comply with the "list maintenance" requirements applicable to "organizers" and "sellers" of certain transactions**.**[3] *TR.  3671/7 – 3672/6.*

5.  Each of the summonses identified 51 subjects about which the IRS might seek testimony from EY representatives.  *GX 337, 340.*  The IRS did not designate specific individuals from whom it sought testimony; rather, it asked EY to identify the individuals.  Mr. Coplan was identified, but he was not designated to discuss any one or more of the 51 topics specifically.  Rather, he was directed to "show up and answer questions." TR. 3676.

6.  On June 20, 2002, Mr. Coplan gave testimony in connection with the promoter examination commenced in March 2002.  At the outset of the testimony, Maureen

---

[2]  Treas. Regs. §301.6111-T.
[3]  Treas. Regs. §301.6112-1T (prior to amendment by TD 9018, 10/17/2002).

2187960.1

Loviglio, an IRS "senior analyst" conducting the initial examination advised Mr. Coplan,

"As you know, we're conducting an examination of – on – with respect to tax shelters

and the requirements under 6707 and 6708…."  GX343-R, at p. 5   The deposition ran

from 9:10 AM to 1:05 PM and included questions on a broad range of subjects related to

transactions presented by EY to its clients. Mr. Coplan answered all questions asked, did

not decline to respond to any question, and was "fully cooperative."  TR.  3677/17-22.

       7. Ms. Taverna described the purpose of the "promoter exam" as follows:

> We need to figure out if the entity or the individual that we have
> under examination, promoter examination, was a principal,
> [sic][4]organizer, an organizer seller under the definitions of the tax
> law of tax shelters.  And if they fit that category, whether the tax
> shelters that they organized, sold, implemented, managed would be
> required to be registered as a tax shelter with the Internal Revenue
> Service.  Along with that, if they were, if they maintained an
> investor list and they would have to turn over the investor list under
> the tax laws.

TR. 3640-1.   When asked what "kinds of factors are looked at in determining whether a

particular transaction has to be registered," Ms. Taverna responded:

> …[W]e look at the tax benefits that are represented to a potential
> investor in the transaction.  We look to whether the transaction is
> geared towards deferral of income or whether it would generate
> deductions, any type of credit or a loss from the transaction.  And
> then we would look to what the investor would have to potentially
> invest in a transaction and how of all of these representations are
> made to an investor by the entity or the individual, who would be
> the principal, organizer, seller, manager of the tax shelter.

TR. 3645.  When asked why the Internal Revenue Service asked for various categories of

documents, Ms. Taverna gave essentially the same answer each time:  "It would assist us

in determining whether Ernst & Young or the investment adviser was an organizer, seller

---

[4]  Although the transcript inserts a comma between the words "principal" and "organizer", Ms. Taverna was evidently referring to the phrase "principal organizer" as it appears in Treas. Reg. §301.6111-1T, Q & A 27.

or manager of the transaction." (In some instances, she added the term 'principal.')  TR. 3652/12-17; TR. 3653/2-5; 16-20; TR. 3654/4-7; TR. 3656/1-3; 20-22; TR. 36572-5.

Finally, Ms. Taverna testified that Mr. Coplan's deposition transcript was "reviewed" and "discussed" and that "generally speaking" the examination team conducting the Ernst & Young promoter examination used it "[if] there were issues that came up that we needed to follow up and request additional information from Ernst & Young, we used the information to determine whether Ernst & Young was a principal, [sic]organizer, manager or seller and whether the transactions were tax shelters or required to be registered, if an investor list needed to be maintained, and if all of the requirements were met."  TR.  3662/12-21.

8.  While Ms. Taverna discussed Mr. Coplan's transcript in general and as a whole, she did not refer at all to any specific statements within the transcript, much less to the specific statements which form the basis of Count Seven in the indictment.[5]

## III.  LAW - MATERIALITY

It is axiomatic that in order to convict a person for violating  18 U.S.C. §1001 by making a false statement or representation, the prosecution must prove beyond a reasonable doubt that the statement was false, was known by its maker to be false at the time it was made, was made in a matter within the jurisdiction of a federal agency, and was material.  "Material" means that, "The statement must have 'a natural tendency to influence, or [be] capable of influencing, *the decision* of the decisionmaking body to

---

[5]  One would have expected Ms. Taverna to testify how the particular statements identified in the indictment were relevant to the determination of the penalties under §§6707 and 6708.  See, e.g. *United States v. Keefer*, 799 F. 2d 1115 (6th Cir. 1986), affirming conviction for making false statements to the FHA  because the FHA employees who processed the applications containing the statements explained how the statements were evaluated in the decision to make a loan, and how the truthful answer would have affected that decision.  She did not.

2187960.1

which it was addressed.'" *United States v. Gaudin,* 515 U.S. 506, 509 (1995), (emphasis added) citing *Kungys v. United States,* 485 U.S. 759, 770 (1988). Furthermore:

> Deciding whether a statement is "material" requires the determination of at least two subsidiary questions of purely historical fact: (a) "what statement was made" and (b) "what decision was the agency trying to make?"

*Gaudin,* at 512. "...[T]he use of the word 'material' serves to distinguish the trivial from the substantive, drawing the line between statements that appear to be capable of influencing an outcome and those that do not." *Kungys*, at 786-7. (Stevens, J., concurring.)

The mere fact that a statement is made in connection with a matter before a federal agency does not make it material within the meaning of §1001. *Id.* at 774. Indeed, as one court has recently observed:

> A question is not material just because the Government asked it. If that were the standard, the materiality element would be rendered meaningless as the Government would be able to establish the scope of the ....inquiry simply by deciding which questions to ask.

*United States v. Peterson*, 2008 WL 4831700 (M.D. Ga. 2008).[6]

Moreover, a superficial statement that the agency "used" the information is not sufficient to establish materiality. "What is relevant is what would have ensued from official knowledge of the misrepresented fact...." *Kungys*, at 1549. For example, in *United States v. Beer*, 518 F. 2d 168 (5th Cir. 1975), the Court considered a conviction under §1001 of a bank official who had incorrectly answered a question on an Officer's Questionnaire submitted to the FDIC. The Court observed:

---

[6] In *Peterson,* the District Court entered a judgment of acquittal in a prosecution for, *inter alia,* perjury for giving false testimony before a grand jury. The materiality analysis is the same whether the case is brought under the perjury statute or §1001.

2187960.1

> The difficulty is that the only evidence of the materiality of Beer's answer…was the general testimony of …a senior head bank examiner for the FDIC.  He testified that the FDIC relies on the questionnaire to provide information not otherwise available in the bank records.  [He] was never asked, however, about the potential effect of a false answer …upon the functioning of the agency nor did he say what the FDIC might have done had the question been answered truthfully, other than to say that such a false statement would not authorize him to cancel the bank's federal deposit insurance.

518 F. 2d at 170.  The Court pointed out that the important questions were "…[W]hat would the FDIC have done had it learned [the true fact]?  How could [the FDIC's] functions, or some determination which it was required to make, have been impaired?" *Id.*  Since, "from the evidence in this record we cannot answer these questions with that degree of certainty sufficient to justify a felony conviction….," a verdict of acquittal was entered. *Id*. at 172.  Compare, *United States v. Swaim,* 757 F. 2d 1530 (5th Cir. 1985) (testimony that statement of purchase price in loan application was significant to loan decision and concealment of true purchase price could impair agency's function held sufficient to support finding of materiality).  Where

> …the government failed to present any testimony by witnesses to prove an actual, a probable, or even a possible impact on the…decision….we are left to hypothesize.  Hypothesizing is no substitute for substantive proof….

*United States v. Stelmokas*, 100 F. 3d 302, 342 (3rd Cir., 1997).

Materiality is a question of fact to be determined by the jury.  *Gaudin,* 515 U.S. at 518-19.  However, like any other element of a crime, if the government has failed to present sufficient evidence from which the jury can determine that a particular statement was material, then a judgment of acquittal under Rule 29 is warranted.  The standard is a strict one:  "A court may grant a judgment of acquittal only if it is convinced that 'the

2187960.1

evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. McPherson,* 424 F. 3d 183, 187 (2d Cir. 2005), citing *United States v. Guadegna*, 814 F. 3d 122, 129 (2d Cir. 1999). But it is not insuperable.  Viewed against this standard, it is clear that the government has failed to present sufficient evidence that any of the statements was material.

**A.  Argument – The Government Has Failed to Present Sufficient Evidence That Any of the Alleged False Statements Was Material.**

Review of each of the alleged false statements identified in Count Seven demonstrates that they had nothing to do with the "decision the agency was trying to make" in the promoter examination and that the prosecution has failed to present any evidence from which the jury could conclude that they did.

**1.  Distribution of Add-On Materials**

Count Seven alleges that Mr. Coplan made a materially false statement when, in response to a question regarding why he directed that certain materials related to the Bolton [Add-On] transaction, not be distributed, he responded:

> We didn't see the need to….We didn't think the transaction was that complicated …so we only really had it for internal purposes.

There is simply no evidence in the record from which a jury could determine that this statement, even if false, could have influenced the Internal Revenue Service's determination as to whether or not Ernst & Young was liable for penalties under §§6707 and 6708.  The statement has nothing to do with any part of the mathematical formula that determines whether a transaction constitutes a "tax shelter" under §6707; nor does it impact the determination of whether or not Ernst & Young was an organizer or seller so

8

as to trigger the list maintenance requirements relevant to the penalty under §6708.  Even if Mr. Coplan had answered the question the way the government apparently contends he should have (i.e. "because we didn't want the IRS to see such a document"), there is no evidence from which the jury can conclude that the Service's judgment about the penalties would or could have been affected in any way.

### 2.  Operation of the Add-On Partnership

Count Seven charges that Mr. Coplan made a false statement when, in digressing in response to a question about whether or not the counterparty in the Add-On transaction was a U.S. entity, he observed that:

> Ernst & Young had nothing really to do with the operation of that partnership.***Ernst & Young really didn't have involvement in the decisions that the general partner made as to who to use to do the trading, how to structure those trades.  It was really their investment decision and their decision as general partner.  They didn't have to ask us anything.

Only under under the most strained interpretation of the facts can this statement be considered false.  But, even if it was, the prosecution has failed to articulate how a different answer could have influenced the determination of Ernst & Young's liabilities for the penalties then being considered.  Simply having a witness state that the transcript containing this statement was "read and discussed" does not provide the jury sufficient evidence from which it can conclude that the agency's decision would or could have been affected in any way.

### 3.  Origin of the Add-On Transaction

The indictment sets forth three different portions of the transcript involving the "cover story,"  all of which have to do with the assertion that the CDS partnerships would

2187960.1

transfer their trading accounts to one consolidated entity at the behest of Andrew Krieger

at Deerhurst.  The alleged false statements are:

>    …we looked at the fact that the partnerships were existing
>    partnerships, they had been doing some of this trading, and that
>    there was going to be a transfer of the trading accounts to this
>    [Financial Advisor][7] outfit for management, and he said, I'm not
>    going to manage a whole bunch of these little accounts, I'm going to
>    put all of these things into an LLC so I can do 1 account trading for
>    these options.  And it was 1 of those circumstances where his tax
>    planner……We hear about the concept of transferring a long and a
>    short option that aren't matched and getting basis and not having to
>    reduce it for the liability, and so here was a kind of fortuitous
>    circumstance where if these accounts are going to be transferred into
>    an entity anyway, that it's a matter of taking the tax position….
>
>    …we said, hey, if you are happening to be forming these –
>    transferring these trading accounts over to [Financial Advisor] and
>    he's going to be put them in an LLC, we know this tax idea.
>
>    The [Add-On] transaction wasn't really done that way.  It
>    was done based on the fact that the partnerships were transferring
>    their trade – I mean, it really was a fact that existed prior to the tax
>    idea.  In other words, the LLC was formed as an LLC because of
>    Mr. [K's] interest in forming an LLC for all those trading
>    accounts….And so they moved it and he said, if I'm going to do this
>    trading for you, I'm going to have all these accounts in 1 entity.

As the evidence at trial has established, the tax benefit from this transaction

flowed from the contribution of the options to any partnership.  Whether the

partnership to which the options were contributed was formed because Mr. Krieger

preferred it or for any other reason is simply irrelevant to any determination affecting

the imposition of penalties under §§6707 and 6708.  Worse, the jury has been given

no evidence whatsoever from which it could decide how the determination could be

---

[7]   The SI uses code words to refer to various individuals and entities, and also interpolates the names of
transactions where they do not appear in the original transcript.  For purposes of this memorandum,
Defendant has set forth the quoted passages as they appear in the SI.

2187960.1

affected.  Accordingly, the government has failed to marshal sufficient evidence to

demonstrate that these statements were material.

### 4.  Early Termination

The indictment charges that Mr. Coplan made a false statement when, in response

to a question about whether clients were "concerned about the large capital gain at the

end of the [CDS] transaction," he stated:

> …well, they weren't sure that would happen, because they had to
> make a decision on the economic side to – they would have to
> decide early  - terminate the swap, because the swap was scheduled
> to run for 18 months.  And so a decision was required on their part
> or the counterparties' part to terminate the swap prior to majority
> [sic]."[8]

As discussed below, this statement is literally true and was confirmed by two of

the government's witnesses..  But, in any event, it has not been shown to have been

material to the promoter penalty examination.

It is not clear what the government claims Mr. Coplan should have said in

response to a question about the clients' "concerns."  Although it has been a theme of this

prosecution that the Defendants conspired to mislead the IRS about the "assumption" or

"expectation" that the CDS swap transactions would be terminated prior to maturity, the

question asked here did not ask what the client <u>planned</u> to do.  Rather, it asked what the

clients' "concerns" were about triggering income.  Had Mr. Coplan volunteered a

different but equally digressive response – that the clients all expected to terminate early

– there is no evidence that the analysis under §§6707 and 6708 would have been any

different.  This is particularly true since in response to the very next question about

---

[8] Presumably the word "majority" meant "maturity."

2187960.1

whether all the "partnerships" terminated early[9], Mr. Coplan stated that they had. And, as with the other topics discussed above, the proof adduced by the government does not permit the jury to determine how the decision might have been influenced by this statement.

**5. PICO Fees**.

The indictment alleges that Mr. Coplan testified falsely when he stated that, with respect to the PICO transaction:

> We [Ernst & Young] also received a fee from Bricolage for consulting with them on the transaction….We were advising them on the tax aspects of the results of investors investing in these types of S corporations.

The government's theory of falsity with respect to this statement is not entirely clear but seems to be that the fee was not for "consulting with Bricolage" but was actually for introducing the taxpayers to the PICO transaction. Regardless, the evidence presented through Ms. Taverna was wholly insufficient to support of a finding of materiality, since the government failed to elicit from the witness how this information was relevant to the penalty determination being made or what effect a "truthful" answer might have had. Therefore, it has failed to present sufficient evidence from which the jury could conclude that the statement was material.

**IV.  LAW – LITERAL TRUTH**

In *Bronston v. United States*, 409 U.S. 352 (1973), the Supreme Court held that a person cannot be convicted of perjury for an answer given under oath that is literally true, even if it is unresponsive or intentionally misleading. This "literal truth" defense also applies to prosecutions under §1001. *United States v. Mandanici*, 729 F. 2d 914, 921 (2d

---

[9] Presumably the questioner was asking whether the swaps, not the partnerships, terminated prior to maturity.

2187960.1

Cir. 1984); *United States v. Carey,* 152 F. Supp. 2d 415, 424 (S.D.N.Y. 2001). While generally the question of literal truth is for the jury, "the court may make this determination in limited circumstances, where 'there can be no doubt that [the defendant's] answers were literally true under any conceivable interpretation of the questions." *Id.,* citing *United States v. Lighte*, 782 F. 2d 367 (2d Cir. 1986).

### A. Argument

Applying this principle to the case at bar, it is clear that the Court may determine at this stage that at least one of the false statements alleged in the indictment is literally true. With respect to the CDS transaction, Mr. Coplan testified that, "a decision was required on their [the clients'] part or the counterparties' part to terminate the swap" early. This was literally true, and was confirmed by the trial testimony of government witnesses Belle Six (*see* TR. 2601-2604) and Jason Rydberg (*see* TR. 4735-4737). .

Significantly, Mr. Coplan was not asked whether the clients had an assumption or expectation that they would terminate the swaps early; indeed, he was not asked anything remotely like that question. Rather, he was asked whether the clients were "concerned about the large capital gain at the end" of the CDS transaction. If his answer was not directly on point, "…[I]t [was] the responsibility of the lawyer to probe…to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination." *Bronston*, 409 U.S. at 358-9. But he is not charged with providing an unresponsive answer – he is charged with making a false statement. His statement has

2187960.1

been proven to be correct.  Accordingly, he is entitled to judgment of acquittal on at least

this portion of Count Seven.

Respectfully submitted,

/s/ Paula M. Junghans
Paula M. Junghans
M. Sandy Weinberg
Andrew Goldfarb
ZUCKERMAN SPAEDER LLP
1800 M Street N.W., Suite 1000
Washington DC  20036
(202) 778-1850

Attorneys for Defendant
Robert B. Coplan

2187960.1